CHANEY & HOPE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12431–78.     Filed January 24, 1983.

---

*Robert L. Trimble* and *Thomas R. Helfand,* for the petitioner.

*William P. Hardeman,* for the respondent.

SCOTT, *Judge*: Respondent determined liabilities of petitioner Chaney & Hope, Inc., as transferee based upon deficiencies in income tax of its transferor, Alps Corp., for its fiscal years ended September 30, 1973, September 30, 1974, and the period October 1, 1974, through July 31, 1975, in the respective amounts of $4,919.20, $5,138.38, and $6,876.93.

The issue for decision is whether Alps Corp. was availed of during each of its fiscal years ended September 30, 1973 and 1974, and the period October 1, 1974, through July 31, 1975,

for the purpose of avoiding Federal income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being distributed, within the meaning of section 532.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Chaney & Hope, Inc. (petitioner), is a corporation duly organized under the laws of the State of Texas. At the time of the filing of its petition here, petitioner maintained its principal place of business in Addison, Tex.

Petitioner is the successor to a group of several Texas corporations, the first of which was formed in 1958. Since that date, other corporations belonging to this group have at various times been formed, operated, and then subsequently merged into another member of the group. All of these corporations have been involved in and have engaged in the construction business. There was no parent-subsidiary relationship between these corporations. Rather, they were brother-sister corporations, a majority stock interest in each corporation being owned by the same individual, Grover Hope. Mr. Hope, Mr. Hope's children, and two other individuals, at least as of October 1, 1972, were the common shareholders in the three then-existing corporations. Mr. Hope has been the president and a director of each of the corporations in the group. Table I on page 266 sets forth the date of incorporation of each of these corporations and the various dates upon which each was merged into another in the group.

The reason for Mr. Hope's formation and operation of several corporations, each of which was involved in or engaged in the construction business, was to employ what is known as a double-breasting technique. Mr. Hope's employment of this technique stemmed from his decision to seek construction work in areas of the country other than the Dallas, Tex., area. At one time or another, Mr. Hope's corporations have done construction work in each of the States comprising the

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue.

## TABLE I

| | Alps Corp. (Incorporated 1/24/58) | Chaney & Hope, Inc.[1] (Incorporated 10/23/61) | Addison Machinery Co., Inc. (Incorporated 2/20/62) |
|---|---|---|---|
| (1) 5/16/72 | | Merged into Addison Machinery | Addison Machinery Co., Inc., successor by merger of Chaney & Hope, Inc. |
| (2) 7/31/75 | Merged into Addison Machinery; however, name of successor corporation changed to Chaney & Hope, Inc. | | Addison Machinery Co., Inc., successor by merger of Alps Corp., surviving corporation is renamed Chaney & Hope, Inc. |

[1] Prior to incorporation, Chaney & Hope had been operated as a partnership. The partnership had been engaged in the construction business prior to the incorporation of Alps Corp., which was formed to serve in a double-breasted operation with the partnership.

southern half of the United States. Basically, this technique allows Mr. Hope, acting through his several corporations, to take best advantage of the particular union connections each corporation maintains in conducting its operations. For example, assuming that nonunion labor can be used on the project, the corporation which runs its operations on an open shop or nonunion basis would be the one in the group which would submit a bid to be the job's general contractor. Another example would be a situation where one of the corporations maintained a working relationship with a union whose members were permitted to perform a wide range of tasks on a project upon which they were employed. Since these workers can be employed to perform a wider variety of tasks, fewer total workers could be employed on the project. There would thus be a significant savings in labor costs using members of this union, as opposed to employing members of another union which is stricter in that it allows only workers possessing a specified job description or rating to perform certain tasks. Therefore, the corporation affiliated with the union which allows a contractor to employ its members to perform a wider variety of tasks would be the corporation in the group which would make a bid. Essentially, through his operation of several brother-sister corporations, Mr. Hope could choose to operate through the corporation whose setup would offer the most competitive advantages in light of the labor situation in the particular area where the prospective job was located.[2]

Mr. Hope, through his corporations, sought to be the general contractor of large construction projects which generally required bonding. In the course of his involvement with a project, a contractor is required to furnish two types of bonds: (1) A bid bond and (2) a performance bond.

In order to be in a position to submit a bid on a construction project in which he is interested, a contractor must first obtain a set of the plans from the owner of the proposed project. Only

[2]Mr. Hope in effect testified that, while a contractor's enrollment with a particular union would not legally obligate him to use that union's members on most of his projects, as a practical matter, a contractor engaged in doing large projects was constrained to do so. He explained that the work undertaken by his corporations involved projects which could last as long as 2 or 3 years. Thus, he stated, if a contractor doing this type of work breached his commitment to a union by not using its members on a particular project, the union would find out and make trouble for the contractor.

upon obtaining the plans is the contractor able to make a reasonable estimate of his cost of construction and thus arrive at the amount which he will submit as his bid on the project. However, in order to obtain a set of the plans, the contractor is required to post a bid bond. One of the purposes of the bond, from the owner's standpoint, is to ensure that the contractor will return the plans if he is not selected to do the job. However, of chief importance to the owner is that the bond assures him that the contractor, if selected, will enter into a contract to do the job for the amount bid.

Generally, a bid bond would be issued by a bonding company for an amount that would vary from 5 percent to 20 percent of the amount of the bid. By the issuance of this bond, the bonding company is guaranteeing to the owner that the bonding company will pay to the owner the face amount of the bond if the contractor fails to provide a performance and payment bond and enter into a contract for the construction of the project if his bid is selected. Thus, the bonding company is also in effect guaranteeing to the owner that, if the contractor is awarded the job, the bonding company will issue the contractor a performance bond.

The performance bond is the other bond a contractor is required to provide. This bond is a precondition to the owner's entering into a construction contract with the bidder. The bonding company, by issuing the performance bond, guarantees the owner that the contractor will complete the project at the contract price. Pursuant to this guarantee secured by the performance bond, if the contractor is unable to complete the contract, a new prime contractor would be employed by the owner or the bonding company to complete the project. If the amounts paid to the original contractor plus the amounts paid to the new prime contractor exceed the contract price, then the owner would be reimbursed by the bonding company for the amount spent in excess of the contract price.

In order for a bonding company to be willing to issue a performance bond, a bonding company would usually require (1) that the company pay a premium or fee for the bond; (2) that the company maintain a substantial liquid financial position; and (3) that the company indemnify the bonding company for any loss. In examining a contractor's liquidity position, a bonding company normally would look at the

amount of the company's net quick assets (cash plus short-term receivables less current liabilities) in relation to the total contract price of all of the contracts on which a contractor is working, plus all of the contracts on which the contractor is bidding, in order to determine if a contractor has an acceptable liquid financial position. Generally, a bonding company would issue a performance bond only if the total contracts in progress, plus the total contracts bid on, did not exceed 10 times the lesser of the company's net liquid assets[3] or its net worth. As a result, the more net liquid assets a contractor has, the greater the total size of the projects he is in a position to undertake.

The corporations in the group obtained bonding from the Travelers Indemnity Co. of Hartford, Conn. (Travelers). In its dealings with the corporations, Travelers treated them in substance as being one entity for bonding purposes. In September 1967, Travelers required the three corporations then in the group, Alps Corp., Chaney & Hope, Inc., and Addison Machinery Co., Inc. (Addison), to enter into a general agreement of indemnity. Under this agreement, each of the corporations agreed to indemnify Travelers for any losses suffered as a result of its issuance of a bond to any of the three corporations.

Any one or more of the corporations could terminate the indemnity agreement upon giving at least 10 days' notice to Travelers. However, any such termination would not affect the corporation's liability as co-indemnitor on any construction work which Travelers had already bonded. The indemnity agreement provided, in pertinent part, as follows:

> This Agreement may be terminated by the Indemnitors, or any one or more of the parties so designated, upon written notice to the Company of not less than 10 days, but any such notice of termination shall not operate to modify, bar or discharge the liability of any party hereto, upon or by reason of any and all such obligations that may be then in force.

------

[3]One reason for requiring a contractor to have this minimum level of liquidity is to ensure that he has sufficient operating funds with which to complete the work he will have under the contract. Construction contracts often permit the owner to retain a percentage of the payments owed the contractor until the project is completed, the purpose of such withholding being to ensure that the work is done to the owner's satisfaction. As a result, a contractor may have most of his profits withheld from him until completion and, during this period of time, the contractor's only readily available source of operating funds would be his own liquid assets.

Travelers, throughout its dealings with these corporations, strongly suggested that all the corporations be merged or combined into a single corporation. Travelers desired that this be done because it would be easier for Travelers to deal with a single corporation rather than two or three separate corporations. Travelers would have to examine only one set of books rather than three, and would have to proceed against only one corporation to obtain indemnity.

Addison was in the business of heavy construction and usually worked on construction projects such as ammunition plants, firing ranges, roads, power systems, fuel depots, dams, municipal water supply and sewage systems, and lakeside recreational facilities, including shelter areas, bath houses, etc., for various departments of the Federal, State, and municipal Governments.

Alps Corp. was incorporated to engage in the business of being a general contractor on large construction projects in a double-breasted capacity with the Chaney & Hope partnership. The corporation had also engaged in the business of being an electrical subcontractor. At one time, Alps Corp. did seek to do electrical subcontracting work for general contractors other than its sister corporations. However, prior to the first year here in issue all subcontracting work performed by Alps Corp. was on construction projects on which one of its sister corporations was the general contractor. Normally, a general contractor will require his subcontractor to furnish a performance bond on the subcontract work. However, such a performance bond was not required of Alps Corp. if it undertook to be the electrical subcontractor for any of its sister corporations because the indemnity agreement which had been entered into in 1967 made such a bond superfluous.

In 1970, Alps Corp. had begun work as the general contractor on a project involving the construction of a water plant at Fort Leonardwood, Mo., for the U.S. Army Corps of Engineers. Construction of the project was completed sometime during 1971. However, Alps Corp. never received a letter of completion from the Army Corps of Engineers. Even after completion of construction, a general contractor is usually liable for a 1-year period on a warranty he gives the owner on the work done. The warranty period normally begins upon the owner's giving a letter of completion to the general contractor.

However, owners, at times, delay giving the contractor a letter of completion. Alps Corp. never received a completion letter for the Fort Leonardwood project. Final payment for that project was received in August 1975, after Alps Corp.'s merger into Addison.

By the beginning of the first year here in issue, Alps Corp. had taken over the general office management function of Addison, its sister corporation. As noted previously, on May 16, 1972, Chaney & Hope, Inc., merged into Addison, although Addison subsequently did business using the name Chaney & Hope. This management function which Alps Corp. undertook involved maintaining all books and records, handling all correspondence on jobs, making out payrolls, reviewing and making payments on the invoices submitted by various suppliers and subcontractors, and also submitting various reports to Government agencies for its sister corporation. The administrative personnel and the top management who performed these management functions were paid by Alps Corp. out of its own funds. All persons performing management work for the two corporations were therefore employed by Alps. In return for handling the management function of Addison, Alps Corp. was paid a management fee based upon the percentage of work Addison had in progress. The fee varied from 1 to 3 percent of the work Addison had in progress.

Alps Corp. undertook this management function because, although the two corporations were separate, they both had the same common shareholders and thus there was no need to maintain separate teams of management and administrative personnel.

In addition, Alps Corp. also furnished bids on almost all of the electrical subcontracting work involved in projects of which Addison was the general contractor. Alps Corp., during the years in issue, never did any actual electrical subcontracting work. However, the bids which Alps Corp. made were of great use to Addison for purposes of evaluating the bids submitted by other electrical subcontractors. Alps Corp.'s bid provided a standard against which Addison could compare the bids it had received from other subcontractors. Because of their specialization in electrical work, local subcontractors were often able to perform the work for less than it would have cost either Addison or Alps Corp. to do the job. On occasions

when Alps Corp.'s bid was the lowest initially submitted, Addison was able to go back and negotiate to have a local electrical contractor do the work for a lesser amount than had originally been bid. Alps Corp., during the years in issue, had only two employees who worked up its bids on electrical subcontracting work. At that time, all the work these employees did concerning electrical subcontracting was in connection with making out bids on the electrical subcontracting work to be done on projects on which Addison was the general contractor.

During the period in issue, the construction industry was in a slump as a result of the economy's being in a recession. The quantity of construction work available during this period was not as large as previously and there was increased competition for the available jobs.

Beginning at least as of October 1, 1972, the outstanding shares of Addison and Alps Corp. were held by the following individuals in the amounts indicated:

| | Number of shares owned | |
| --- | --- | --- |
| Stockholder | Addison | Alps Corp. |
| Grover Hope .................. | 127 (63.5%) | 710 (71.0%) |
| Byron Whitmarsh ............ | 42 (21.0%) | 210 (21.0%) |
| Ray Cook ..................... | 16 ( 8.0%) | 80 ( 8.0%) |
| Hope's three children ....... | 15 ( 7.5%) | 0 |
| Total shares outstanding ... | 200 (100%) | 1,000 (100%) |

On the July 31, 1975, date of the merger of Alps Corp. into Addison, the shares in the two corporations were held by the following individuals in the amounts indicated:

| | Number of shares owned | |
| --- | --- | --- |
| Stockholder | Addison | Alps Corp. |
| Grover Hope .................. | 9,713 (63.5%) | 710 (71.0%) |
| Byron Whitmarsh ............ | 3,214 (21.0%) | 210 (21.0%) |
| Ray Cook ..................... | 1,224 ( 8.0%) | 80 ( 8.0%) |
| Hope's three children ....... | 1,149 ( 7.5%) | 0 |
| Total shares outstanding ... | 15,300 (100%) | 1,000 (100%) |

Immediately after the merger of Alps Corp. and Addison on July 31, 1975, the outstanding shares in the corporation were held by the following individuals in the amounts indicated:

| Stockholder | Number of shares owned |
|---|---|
| Grover Hope | 17,737 (66.7%) |
| Byron Whitmarsh | 5,586 (21.0%) |
| Ray Cook | 2,128 ( 8.0%) |
| Hope's three children | 1,149 ( 4.3%) |
| Total shares outstanding | 26,600 (100%) |

For the period from October 1, 1967, through July 31, 1975, Alps Corp. had the following amounts of taxable income in the fiscal years indicated:

| FYE | Amount |
|---|---|
| 9/30/68 | $25,753.83 |
| 9/30/69 | 28,111.45 |
| 9/30/70 | 24,866.74 |
| 9/30/71 | 20,796.96 |
| 9/30/72 | 24,285.59 |
| 9/30/73 | 24,845.00 |
| 9/30/74 | 23,955.00 |
| 7/31/75 | 32,355.24 |

Alps Corp. had no nontaxable income in any of these fiscal years.

No cash dividends were paid by Alps Corp. during its entire existence.

The following table sets forth the net worth and the net quick assets of Addison and Alps Corp. as well as the combined total net quick assets of both corporations and the volume of work under contract during the period from February 1, 1972, through January 31, 1978:

| FYE Jan. 31— | Addison—Chaney & Hope | | Alps Corp. | | Totals | |
|---|---|---|---|---|---|---|
| | Net worth | Net quick | Net worth | Net quick | Net quick | Work under construction |
| 1973 | $387,358 | $374,513 | $225,718 | $225,693 | $600,206 | $5,743,444 |
| 1974 | 251,211 | 349,219 | 246,085 | 246,062 | 595,281 | 4,221,664 |
| 1975 | 375,275 | 230,815 | 276,291 | 276,267 | 507,082 | 6,361,026 |
| 1976 | 631,295 | 1,148,371 | Merged into C&H | | 1,148,371 | 7,858,945 |
| 1977 | 690,809 | 859,549 | --- | --- | 859,549 | 4,745,722 |
| 1978 | 782,901 | 657,345 | --- | --- | 657,345 | 9,533,572 |

At the end of its fiscal years 1973 and 1974, Alps Corp. had current assets and current liabilities as follows:

|      | Current assets | Current liabilities | Ratio of current assets to current liabilities |
|------|----------------|---------------------|------------------------------------------------|
| 1973 | $284,014       | $46,397             | 6.32 to 1                                      |
| 1974 | 312,897        | 55,178              | 5.67 to 1                                      |

A portion of these current assets which consisted of accounts receivable from its sister corporation, Addison, and from Beltwood, another corporation in which Mr. Hope owned stock, were as follows:

| Company | Amount | |
|---------|--------|--------|
|         | 1973   | 1974   |
| Addison ............... | $12,706.53 | $12,706.53 |
| Beltwood .............. | 1,520.00 | 0 |
| Total .............. | 14,226.53 | 12,706.53 |

The Schedule L—Balance Sheets included in the U.S. corporation income tax return filed by Alps Corp. for its fiscal year ended September 30, 1973, disclosed the assets and liabilities and stockholders equity at the beginning and end of the year as shown on pages 276–277. The Schedule M-2—Analysis of Unappropriated Retained Earnings per Books, indicated the following:

1 Balance at beginning of year ................... $206,289
2 Net income per books .. 17,888
3 Other increases (itemize) _____
4    Total of lines 1, 2, and 3 ......... 224,177

5 Distributions: (a) Cash ...........
                 (b) Stock ...........
                 (c) Property .......
6 Other decreases (itemize) _____
7    Total of lines 5 and 6 .....
8 Balance at end of year (line 4 less 7) ................... $224,177

The Schedule L—Balance Sheets included in the U.S. corporation income tax return filed by Alps Corp. for its taxable year ended September 30, 1974, disclosed the assets and liabilities and stockholders equity at the beginning and at the end of the year as shown on pages 278–279. The Schedule M-2—Analysis of Unappropriated Retained Earnings Per Books, included in the return, showed the following:

1 Balance at beginning of year ... $224,177
2 Net income per books .. 18,685
3 Other increases (itemize) _____
4 Total of lines 1, 2, and 3 ......... 242,862

5 Distributions: (a) Cash ...........
           (b) Stock ...........
           (c) Property .......
6 Other decreases (itemize) _____ $43
    See statement 3
7 Total of lines 5 and 6 ..... 43
8 Balance at end of year (lines 4 less 7) ................... 242,819

The Schedule M–2—Analysis of Unappropriated Retained Earnings Per Books, included in the return for the period October 1, 1974, through July 31, 1975, showed the following:

1 Balance at beginning of year ............... $242,819.00
2 Net income per books .. 32,355.24
3 Other increases (itemize) _____ –0.53
4 Total of lines 1, 2, and 3 ........ 275,173.71

5 Distributions: (a) Cash .........
           (b) Stock ........
           (c) Property ....
6 Other decreases (itemize) _____ $275,173.71
    See statement 5
7 Total of lines 5 and 6 ... 275,173.71
8 Balance at end of year (line 4 less 7) .................

The merger of Alps Corp. into Addison took place on July 31, 1975, and petitioner thereupon succeeded to all the assets and liabilities of Alps Corp. As of July 31, 1975, there was an account receivable from Grover Hope to Alps Corp. for $47,000. This account receivable was attributable to a short-term advance which Alps Corp. had made to Mr. Hope on July 21, 1975, which was repaid to petitioner, as the successor to Alps Corp. on January 31, 1976.

Respondent sent notification to petitioner by certified mail on January 26, 1978, pursuant to section 534(b), that an adjustment based on accumulated taxable income as defined in section 535 and a resulting tax under section 531 was to be included in the proposed notice of deficiency.[4]

Respondent in his notice of deficiency to petitioner, as transferee and successor in merger to Alps Corp., transferor, gave the following explanation:

It is determined that you were formed or availed of for the purpose of avoiding the income tax with respect to your shareholders by permitting

---

[4]The parties stipulated that petitioner and respondent had previously entered an agreement under which petitioner became, and is, a transferee at law within the meaning of sec. 6901; and, as such, is liable for the deficiency, if any, in income taxes due from its transferor for the taxable years ended Sept. 30, 1973 and 1974, and the period Oct. 1, 1974, through July 31, 1975, plus interest thereon as provided by law.

## Schedule L—BALANCE SHEETS

| ASSETS | Beginning of taxable year | | End of taxable year | |
|---|---|---|---|---|
| | (A) Amount | (B) Total | (C) Amount | (D) Total |
| 1 Cash ......... | | 85,394 | | 269,788 |
| 2 Trade notes and accounts receivable ......... | | | 14,226 | 14,226 |
| (a) Less allowance for bad debts ......... | | | | |
| 3 Inventories ......... | | | | |
| 4 Gov't obligations: (a) U.S. and instrumentalities ......... | | | | |
| (b) State, subdivisions thereof, etc ......... | | | | |
| 5 Other current assets (attach schedule) ......... | | 162,588 | | |
| 6 Loans to stockholders ......... | | | | |
| 7 Mortgage and real estate loans ......... | | | | |
| 8 Other investments (attach schedule) ......... | | | | |
| 9 Buildings and other fixed depreciable assets ......... | 242 | | 242 | |
| (a) Less accumulated depreciation ......... | 218 | 24 | 218 | 24 |
| 10 Depletable assets ......... | | | | |
| (a) Less accumulated depletion ......... | | | | |
| 11 Land (net of any amortization) ......... | | | | |
| 12 Intangible assets (amortizable only) ......... | | | | |
| (a) Less accumulated amortization ......... | | | | |
| 13 Other assets (attach schedule) ......... | | | | |
| 14 Total assets ......... | | 248,006 | | 284,038 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | |
|---|---:|---:|---:|---:|
| 15 Accounts payable | | 20,787 | | 39,440 |
| 16 Mtges., notes, bonds payable in less than 1 yr | | | | |
| 17 Other current liabilities (attach schedule) | | 6,006 | | 5,497 |
| 18 Loans from stockholders | | | | |
| 19 Mtges., notes, bonds payable in 1 yr. or more | | | | |
| 20 Other liabilities (attach schedule) | | | | |
| 21 Capital stock: (a) Preferred stock | | | | |
| (b) Common stock | 10,000 | 10,000 | 10,000 | 10,000 |
| 22 Paid-in or capital surplus (attach reconciliation) | | 4,924 | | 4,924 |
| 23 Retained earnings—Appropriated (attach sch.) | | | | |
| 24 Retained earnings—Unappropriated | | 206,289 | | 224,177 |
| 25 Less cost of treasury stock | | | | |
| 26 Total liabilities and stockholders' equity | | 248,006 | | 284,038 |

## Schedule L—BALANCE SHEETS

| ASSETS | Beginning of taxable year | | End of taxable year | |
|---|---|---|---|---|
| | (A) Amount | (B) Total | (C) Amount | (D) Total |
| 1 Cash | | 269,788 | | 300,190 |
| 2 Trade notes and accounts receivable | 14,226 | | 12,707 | |
| (a) Less allowance for bad debts | | 14,226 | | 12,707 |
| 3 Inventories | | | | |
| 4 Gov't obligations: (a) U.S. and instrumentalities | | | | |
| (b) State, subdivisions thereof, etc | | | | |
| 5 Other current assets (attach schedule) | | | | |
| 6 Loans to stockholders | | | | |
| 7 Mortgage and real estate loans | | | | |
| 8 Other investments (attach schedule) | | | | |
| 9 Buildings and other fixed depreciable assets | 242 | | 242 | |
| (a) Less accumulated depreciation | 218 | 24 | 218 | 24 |
| 10 Depletable assets | | | | |
| (a) Less accumulated depletion | | | | |
| 11 Land (net of any amortization) | | | | |
| 12 Intangible assets (amortizable only) | | | | |
| (a) Less accumulated amortization | | | | |
| 13 Other assets (attach schedule) | | | | |
| 14 Total assets | | 284,038 | | 312,921 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | |
|---|---:|---:|---:|---:|
| 15 Accounts payable | | 39,440 | | 52,508 |
| 16 Mtges., notes, bonds payable in less than 1 yr | | | | |
| 17 Other current liabilities (attach schedule) | | 5,497 | | 2,670 |
| 18 Loans from stockholders | | | | |
| 19 Mtges., notes, bonds payable in 1 yr. or more | | | | |
| 20 Other liabilities (attach schedule) | | | | |
| 21 Capital stock: (a) Preferred stock | 10,000 | | 10,000 | |
|     (b) Common stock | | 10,000 | | 10,000 |
| 22 Paid-in or capital surplus (attach reconciliation) | | 4,924 | | 4,924 |
| 23 Retained earnings—Appropriated (attach sch.) | | | | |
| 24 Retained earnings—Unappropriated | | 224,177 | | 242,819 |
| 25 Less cost of treasury stock | | | | |
| 26 Total liabilities and stockholders' equity | | 284,038 | | 312,921 |

earnings and profits to accumulate instead of being divided or distributed during the taxable years ended September 30, 1973, September 30, 1974, and taxable year October 1, 1974 to July 31, 1975. Accordingly, the accumulated earnings tax provided by section 531, of the Internal Revenue Code is being asserted for those years as computed below:

|  | 7309 | 7409 | 7507 |
| --- | --- | --- | --- |
| Taxable Income | $24,845.00 | $23,955.00 | $32,355.24 |
| Less: Taxes Paid | 6,957.00 | 5,270.00 | 7,348.21 |
| Accumulated Taxable Income | 17,888.00 | 18,685.00 | 25,007.03 |
| Percentage | 27.5% | 27.5% | 27.5% |
| Section 531 Tax | $ 4,919.20 | $ 5,138.38 | $ 6,876.93 |

Notification was sent to you by certified mail on January 26, 1978, pursuant to section 534(b) of the Internal Revenue Code, but no statement in response thereto was filed by you in accordance with the provisions of section 534(c).

OPINION

Section 532(a) provides that every corporation formed or availed of for the purpose of avoiding income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being distributed, shall be subject to the accumulated earnings tax imposed by section 531. Section 533(a)[5] provides that the accumulation of earnings and profits beyond the reasonable needs of the business is determinative of the purpose to avoid income tax with respect to its shareholders, unless the corporation proves to the contrary by a preponderance of the evidence.

Section 535(a)[6] defines "accumulated taxable income" (the recomputed income of the corporation against which tax under section 531 is imposed) as the taxable income of the corpora-

---

[5]Sec. 533(a) provides as follows:

SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

[6]Sec. 535(a) provides as follows:

SEC. 535. ACCUMULATED TAXABLE INCOME.

(a) DEFINITION.—For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)).

tion, as adjusted in section 535(b), less the dividends-paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in section 535(c)). Insofar as here relevant, this accumulated earnings credit is the amount of the corporation's earnings and profits which are retained for the reasonable needs of the business. Where a taxpayer can show that all its current earnings were accumulated for the reasonable needs of the business, there is no accumulated earnings tax since the accumulated credit eliminates the amount against which the tax is imposed. See, e.g., *Magic Mart, Inc. v. Commissioner*, 51 T.C. 775, 799 (1969); *Faber Cement Block Co. v. Commissioner*, 50 T.C. 317, 336 (1968); *John P. Scripps Newspapers v. Commissioner*, 44 T.C. 453, 474 (1965). Whether a taxpayer's accumulation of earnings and profits is in excess of its reasonable needs is a factual question. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938). In this regard, we recognize that the accumulated earnings tax is a penalty tax and for that reason should be strictly construed. *Ivan Allen Co. v. United States*, 422 U.S. 617, 626 (1975).

Respondent does not argue that Alps Corp. was formed for the purpose of avoiding income tax with respect to its shareholders, only that it was availed of for that purpose during each of the years here in issue. Consequently, the arguments of the parties center on the amount necessary to meet the reasonable needs of the business of Alps Corp. Section 537[7] provides that for the purpose of the accumulated earnings tax, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Also, the determination of the reasonable needs of the business is based on the facts which exist at the end of the corporation's taxable year, and "subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of

---

[7]Sec. 537 reads in part as follows:

SEC. 537. REASONABLE NEEDS OF THE BUSINESS.

(a) GENERAL RULE.—For purposes of this part, the term "reasonable needs of the business" includes—

    (1) the reasonably anticipated needs of the business,

    (2) the section 303 redemption needs of the business, and

    (3) the excess business holdings redemption needs of the business.

such taxable year." Sec. 1.537–1(b)(2), Income Tax Regs. Once we determine the amount necessary to satisfy the needs of the business, we will not simply compare this amount with petitioners' total accumulated earnings and profits, but will look to the amount of accumulated earnings and profits which are reflected in the net liquid assets of Alps Corp. *Ivan Allen Co. v. United States, supra* at 628; *Smoot Sand and Gravel Corp. v. Commissioner*, 274 F.2d 495, 501 (4th Cir. 1960), affg. a Memorandum Opinion of this Court; *Montgomery Co. v. Commissioner*, 54 T.C. 986, 1008 (1970). As the Supreme Court stated in *Ivan Allen Co. v. United States, supra* at 628: "The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business."

Alps Corp. in its fiscal years 1973 and 1974, and in its short taxable year ending July 31, 1975, had taxable income of $24,845, $23,955, and $32,355.24, respectively. The balance sheets included in Alps Corp.'s income tax returns disclose that its accumulated earnings were reflected in net quick assets well in excess of $200,000 in each of these years.

Respondent contends that Alps Corp. was accumulating its earnings and profits in the form of liquid assets for the benefit of the business of its sister corporation, Addison. Petitioner, on the other hand, argues that earnings were not accumulated beyond the reasonable needs of the business of Alps Corp. Petitioner advances four grounds justifying the accumulations of Alps Corp. as being within its reasonable business needs: (1) Alps Corp. continued to be in the construction business, and, therefore, had to maintain its bonding capability by retaining a large amount of quick assets; (2) Alps Corp. was under a contractual obligation imposed by the 1967 indemnity agreement with Travelers to maintain a large amount of quick assets; (3) Alps Corp.'s business of furnishing management services to Addison required it to maintain a large amount of quick assets, since Addison's ability to receive bonding was dependent upon the total net quick assets maintained by both corporations; and (4) as to the last year in issue, since Alps Corp.'s merger into Addison could be reasonably anticipated and did take place at the end of such year, Alps Corp. was entitled to make accumulations for the business needs of the combined entities.

Accumulations made in order to satisfy the business needs of a brother or sister corporation cannot generally be considered as accumulations to meet reasonable business needs. The business of the sister corporation is not the business of the corporation. *Factories Investment Corp. v. Commissioner*, 39 T.C. 908 (1963), affd. 328 F.2d 781 (2d Cir. 1964); *Latchis Theaters of Keene, Inc. v. Commissioner*, 19 T.C. 1054 (1953), affd. 214 F.2d 834 (1st Cir. 1954). The fact that the two corporations are owned and effectively controlled by the same individuals does not justify accumulation of earnings by one corporation in order to meet the needs of a sister corporation. To allow accumulations to be made for the needs of a sister corporation would frustrate the major purpose of the accumulated earnings tax, which is to force earnings out of a corporation to its individual shareholders so that they can be taxed a second time at graduated individual income tax rates. *Factories Investment Corp. v. Commissioner, supra* at 916–917; *Latchis Theaters of Keene, Inc. v. Commissioner, supra* at 1065–1066. See also *Inland Terminals, Inc. v. United States*, 477 F.2d 836, 840 (4th Cir. 1973). See further, sec. 1.537–3(b), Income Tax Regs.[8]

The first ground advanced by petitioner as justifying Alps Corp.'s retention of its earnings, is that the accumulations were needed for Alps Corp.'s own construction business. Petitioner contends that Alps Corp. was still engaged in the business of being a general contractor. Throughout the years here in issue, petitioner maintains that Alps Corp. was available to serve as a general contractor on construction

---

[8]While a corporation may not accumulate its earnings for the business needs of a sister corporation, it is recognized in certain instances that a parent corporation may properly accumulate its earnings for the needs of a subsidiary. In such instances, the business of the subsidiary is considered to be in effect the business of the parent corporation. Sec. 1.537–3(b), Income Tax Regs. The rules promulgated in this regulation merely reflect views enunciated by Congress in the accompanying legislative history to the Internal Revenue Code of 1954. S. Rept. 1622, 83d Cong., 2d Sess. 69–70 (1954).

The Fourth Circuit Court of Appeals has extended the principles enunciated in the regulation one step further by holding that it is also permissible for a subsidiary to accumulate its earnings for the business needs of its parent corporation. *Inland Terminals, Inc. v. United States*, 477 F.2d 836 (4th Cir. 1973). However, the Court of Appeals in its opinion made clear that a situation where brother-sister corporations were involved was completely distinguishable from one involving parent-subsidiary corporations. The Court expressed the view that one of the major purposes of the accumulated earnings tax would be frustrated if it was held to be permissible for a corporation to accumulate its earnings by reference to the business needs of its sister corporation.

projects in a double-breasted capacity with its sister corporation, Addison. Since it might reasonably have anticipated bidding and subsequently receiving contracts to serve as the general contractor of a project, petitioner maintains that Alps Corp. had to maintain its bonding capability by retaining a large amount of liquid assets.

The record shows that Alps Corp., during the years in issue, was not engaged in the construction of any projects as a general contractor. Nevertheless, for accumulated earnings tax purposes, the reasonable needs of the business encompass not only accumulations to meet present needs, but also accumulations to meet anticipated future needs. Sec. 1.537–1(b), Income Tax Regs. However, the evidence presented indicates that Alps Corp. accumulated its earnings to increase the bonding capacity of its sister corporation, Addison. Alps Corp. was incorporated to serve as a general contractor on large construction projects in a double-breasted capacity first with Mr. Hope's partnership and later with various sister corporations. From the time of its formation through the years in issue, Alps Corp. never sought work as a general contractor independent of either the Chaney & Hope partnership or its sister corporations. Mr. Hope, the common controlling shareholder, operated all of the corporations in the group in conjunction with one another. The table included in our findings, setting forth the net worth and net quick assets of Alps Corp. and its sister corporation, Addison, as well as the combined net quick assets of both corporations and the total work under construction, shows that the substantial liquid assets maintained by Alps Corp. were utilized to obtain bonding for Addison. All of the work under construction during the years in issue was work for which Addison had received contracts as general contractor. Although Mr. Hope and another officer of Alps Corp. testified at trial, neither gave any testimony of any work which Alps Corp. had under construction as a general contractor. Also, neither witness gave any testimony concerning projects upon which Alps Corp. was seeking to be the general contractor. We are certain that these witnesses would have so testified if such had been the case. On the basis of the record presented, we conclude that any possibility of Alps Corp.'s bidding or receiving a contract to be the general contractor on a project as of the years here in

issue was uncertain and indefinite. Because of this lack of specificity and definiteness, we cannot accept petitioner's contention that the accumulations were made by Alps Corp. to serve its own business needs as a general contractor.

Petitioner next asserts that Alps Corp., during the years here in issue, was engaged in the construction business as a subcontractor, so that the accumulations were necessary for Alps Corp.'s subcontracting business. We do not accept this second contention of petitioner's. The officer who ran Alps Corp.'s day-to-day operations testified at trial. His testimony in effect was that, while at one time the corporation did seek electrical subcontracting work, by the years in issue, Alps Corp. was not actually engaged in the business of being an electrical subcontractor. Alps Corp. did submit bids on the electrical subcontracting work involved in projects upon which Addison was the general contractor. However, it never did any actual electrical subcontracting work. Alps Corp.'s making of the bids was essentially a part of the management services which it rendered to Addison. The electrical subcontracting bids submitted by Alps Corp. were used by Addison to evaluate the bids submitted by other electrical subcontractors. In making a bid, Alps Corp. did not seriously entertain any hopes of actually receiving a subcontract which would require it to perform actual electrical subcontracting work. Indeed, in the several instances when Alps Corp. was initially low bidder, Addison went back and negotiated to have another one of the bidders perform the subcontract work. Thus, Alps Corp.'s accumulations cannot be justified on the ground that such accumulations were necessary for an electrical subcontracting business.

Petitioner asserts that the accumulations were necessary for Alps Corp.'s business since Alps Corp. had possible contingent liability on the Fort Leonardwood project which it had completed in 1971. The warranty on the work done on this project was apparently still in effect at least as of the first year in issue.

We have recognized that a contingent liability is a reasonable need for which a business may provide, if the likelihood of its occurrence would appear to a prudent businessman. *Bremerton Sun Publishing Co. v. Commissioner*, 44 T.C. 566, 586 (1965). However, in order for such contingent liability to be

a reasonable need for which accumulations may be made, the likelihood of its occurrence must be more than merely a remote possibility. *J. Gordon Turnbull, Inc. v. Commissioner*, 41 T.C. 358, 374–375 (1963), affd. 373 F.2d 87 (5th Cir. 1967).

Petitioner has not convinced us that the potential liability of Alps Corp. on its warranty was more than a remote possibility. Alps Corp. had completed the water plant at Fort Leonardwood in 1971. At the trial, neither of the officers who testified brought to our attention any special problems Alps Corp. might anticipate in connection with the work done on the water plant. In fact, the officer who ran day-to-day operations of Alps Corp. testified that he had never experienced any warranty liability in excess of $30,000 to $40,000. Thus, we conclude that any potential liability from the 1971 project was too remote a possibility to justify more than a small fraction, if that, of the accumulation of earnings made here.

The second ground advanced by petitioner for Alps Corp.'s accumulation of its earnings is that the corporation was a party to an indemnity agreement with the bonding company under which it was contractually obligated to maintain a large amount of quick assets. In our view, the mere expedient of entering into a contract cannot, for accumulated earnings tax purposes, justify the retention of earnings by a corporation to meet the needs of its sister corporation. It is clear that Alps Corp. only undertook general contracting work in a standby capacity to its sister corporations. Although in earlier years it had actually undertaken some jobs as a general contractor, the inference that we derive from the record is that the volume of work Alps Corp. had as a general contractor never approached the volume of work undertaken by its sister corporations. Thus, the benefits derived by Alps Corp. in entering into the indemnity agreement were only minimal in comparison to the benefits derived by its sister corporations. Alps Corp.'s entry into the indemnity agreement, as well as its accumulations in the years in issue, were primarily for the benefit of its sister corporations. Thus, we do not view its contractual obligation under the agreement to be a business purpose of Alps Corp. justifying the accumulation of its earnings.

The third ground advanced by petitioner is somewhat related to the previous. Alps Corp., during the years in issue, was engaged in the business of furnishing management

services to Addison. Petitioner asserts that it was necessary for Alps Corp. to maintain a large amount of liquid assets, since Addison's ability to undertake construction work was dependent upon whether it could receive bonding, which in turn depended upon the total amount of net quick assets maintained by both corporations. Addison was the sole customer of Alps Corp.'s management services. Petitioner points out that the more work Addison had under contract, the larger the management fees it would pay to Alps Corp. since the fee was based on a percentage of the total volume of work Addison had.

Alps Corp. did not make any actual loans of its funds to Addison. Rather, its liquid assets were accumulated and pledged with respect to any dealings its sister corporation had with the bonding company. However, if Addison ever needed funds, we do not doubt that Alps Corp. would have furnished the funds by way of a loan to its sister corporation.

One of the grounds listed by the regulations as a factor which may indicate that earnings are accumulated for reasonable needs of the business is the need to provide for loans to suppliers or customers, if necessary, in order to maintain the business of the corporation. Sec. 1.537–2(b)(5), Income Tax Regs. On the other hand, the regulations list accumulations for the purpose of making loans to a brother-sister corporation as a factor which may indicate that earnings are being accumulated beyond the reasonable needs of the business. Sec. 1.537–2(c)(3), Income Tax Regs. Obviously, even though a sister corporation is involved, to the extent that the contemplated loan does not exceed that which would have been furnished to a similar but unaffiliated *customer*, accumulations for such purpose should be considered as for the reasonable needs of the business. Further, in our view, where the benefits to be derived from such course of conduct substantially outweigh the detriments, accumulations for such purpose may be considered as a reasonable business need.

There can thus be a conflict in the application of the two factors listed in the regulations cited above, one of which indicates that the accumulation was for reasonable business needs, while the other indicates to the contrary. In such instance, one inquiry to be made concerns the existence of sound reasons why the sister corporation could not provide for

its own needs. *Factories Investment Corp. v. Commissioner, supra* at 917–918.[9] Here, although Addison did have work under contract almost up to the combined bonding capacity of both itself and Alps Corp., the record indicates that Addison had other avenues by which it could have obtained bonding without relying on the liquid assets of Alps Corp. At the trial, a former employee of the bonding company testified that if a contractor did not initially meet the minimum requirements, there were several means by which he could still satisfy the bonding company. One of these alternatives was to bring in another party in a joint venture. Such other party's financial assets would then be added toward meeting the requirements of the bonding company. This witness also acknowledged that if the shareholder of a corporation was an individual of substantial means, such shareholder could also either pledge his own individual assets or become a co-indemnitor of any liability which the corporation might have to the bonding company. Mr. Hope, the majority shareholder in Addison, was an individual of substantial means. We find that petitioner has not shown that Addison would have been unable to conduct its general contracting business without Alps Corp.'s accumulating and making its funds available to Addison for bonding purposes. Although Addison was the sole customer of Alps Corp.'s management services, we conclude that a stronger showing of business need on Alps Corp.'s part is required where the accumulations have been made to satisfy the needs of a sister corporation. The business of Addison is not the business of Alps Corp. While Alps Corp.'s business of furnishing management services is related to the general contracting business carried on by Addison, in order to show a reasonable business need for accumulation of earnings, petitioner must show some reasonable relationship of the funds furnished to Addison to profits to be received by the maintenance of the business relationship with the sister corporation. Here, Alps Corp.'s accumulation for the purpose of providing funds to a sister corporation which is also its customer has not been shown in the record to be necessary. Although the record shows that under the indemnity agreement Alps Corp.'s assets

[9]See also *31 West 53d Street Corp. v. Commissioner*, T.C. Memo. 1974–32.

were pledged for bonds for Addison, there is no showing that Addison would have been unable to conduct its business as it did without this indemnity agreement. There is no showing that other arrangements could not have been made by Addison to obtain the necessary bonding. Even more important is the fact that by permitting the tying up of its capital in order to provide bonding for Addison, Alps Corp. curtailed its own ability to seek profitable endeavors of its own. In our view, an unrelated corporation would not have so limited its own activities for a small profit from management fees. Although Alps Corp. derived a profit from furnishing management services to Addison, and, during the period here involved, this was its only source of income except for collections on construction work completed in prior years, the record shows the management fee charged was only in an amount which allowed a small net profit after the deduction of the salaries and wages of the personnel Alps Corp. employed to provide these management and administrative services. An unrelated corporation would obviously not have entered into a similar arrangement of pledging its assets for the benefit of such a customer, as it would have been contrary to its business interests. It would have used its assets in a manner more productive of profits from its own business operations. Moreover, this arrangement was carried on over the entire time Alps Corp. was in existence and did not consist of just a few isolated incidents. On this record, petitioner has totally failed to show a need for Alps Corp. to accumulate earnings in the years here in issue to derive management fee income from services rendered to Addison.

The taxpayer in *Factories Investment Corp. v. Commissioner, supra,* made an argument similar to this argument made by petitioner. That taxpayer contended that it needed the accumulation to make loans to its sister corporation, the tenant of its building, which provided its sole source of income. In that case, we pointed out that the taxpayer had failed to show the need of its sister corporation for such loans or that it could not have rented its building to another tenant. Petitioner in this case has likewise failed to show that its own business interests required the accumulation.

In effect, Alps Corp. was used during the period here involved for accumulating earnings and profits for no business

purpose of its own but merely as a means of accumulating earnings and profits to avoid tax to its shareholders. We find that the accumulations were not justified because Alps Corp. furnished management services to its sister corporation. The accumulations made were not necessary for the reasonable business needs of Alps Corp.

Petitioner's last contention is that as of the last period in issue, the period October 1, 1974, through July 31, 1975, Alps Corp. was entitled to accumulate its earnings for the business needs of Addison since its merger into Addison was anticipated and did take place as of the end of such year. A corporation may accumulate its earnings for the purpose of acquiring a business enterprise through the purchase of such other enterprise's stock or assets. Such acquisition of another enterprise is merely one means by which the corporation may expand its business. Sec. 1.537–2(b)(1) and –2(b)(2), Income Tax Regs. Section 1.537–3(a), Income Tax Regs., further states that the business of a corporation is not only the business which it has previously carried on but includes any line of business which it may undertake.

In the present case, it was not contemplated that Alps Corp. would acquire Addison as a subsidiary. Rather, it was planned that the two corporations would be merged into a single entity. Clearly, here the liquid assets maintained by Alps Corp. could be of benefit in the general contracting business to be carried on after the merger. The greater the assets of a construction contracting business, the larger the projects on which it can submit bids on other than a joint venture basis. The combined net quick assets of both Addison and Alps Corp. about 6 months prior to the merger represented less than 10 percent of the volume of the work in progress. Approximately 6 months after the merger, the combined entity had net quick assets representing only 14.6 percent of the work in progress. We have held that a corporation might reasonably accumulate its earnings to meet the needs of a future subsidiary at least as of the year in which acquisition of the subsidiary became reasonably certain.[10] It seems clear that if the earnings of Alps Corp. were accumulated to provide for bona fide business

---

[10]See *Suwanee Lumber Manufacturing Co. v. Commissioner*, T.C. Memo. 1979–477.

expansion and pursuant thereto Addison was merged into Alps Corp., then such accumulation would be reasonable. We do not believe, at least under the circumstances of this case, that the issue should turn on which way the merger went. We conclude here that Alps Corp. could accumulate its earnings for the period October 1, 1974, through July 31, 1975, in order to meet the reasonably anticipated future needs of the expanded business to be conducted by its successor. Though it was to be merged into Addison, Alps Corp. would in substance continue on as part of the combined entity. We find that Alps Corp. was not subject to the accumulated earnings tax for the period October 1, 1974, through July 31, 1975.

However, prior to such year, the merger could not reasonably be said to be definite, since Mr. Hope had for many years resisted the bonding company's suggestion to combine all his corporations into a single entity. We find that Alps Corp. in each of its fiscal years 1973 and 1974, had allowed its earnings to accumulate far beyond its reasonable business needs. We note that petitioner has not submitted any specific estimates of the amount of capital it would need to carry out its actual business operations. Since Alps Corp., during the years in issue, was essentially an auxiliary corporation providing only management and administrative services to its sister corporation, we conclude that any operating needs would be minimal and could have been satisfied currently out of the fees it received from Addison. Since petitioner has failed to carry its burden of proof to show the contrary, the accumulation of earnings beyond the reasonable business needs of Alps Corp. is determinative as establishing that one of the purposes was the avoidance of income tax on its shareholders. Sec. 533(a). See *United States v. Donruss Co.*, 393 U.S. 297, 301 (1969). We find that Alps Corp. is subject to the accumulated earnings tax in each of its fiscal years 1973 and 1974, but is not subject to this tax for the period October 1, 1974, through July 31, 1975.

*Decision will be entered for the respondent for the fiscal years 1973 and 1974, and for the petitioner for the period ended July 31, 1975.*