RHOADES OIL COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rhoades Oil Co. v. Commissioner
Docket Nos. 4926-78, 17287-79.
United States Tax Court
T.C. Memo 1985-322; 1985 Tax Ct. Memo LEXIS 316; 50 T.C.M. (CCH) 294; T.C.M. (RIA) 85322; July 1, 1985. William C. Jones, III, for the petitioner. Charles N. Woodward, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioner's corporate income tax as follows: Docket No.
Year
Deficiency
4926-78
1974
$274,875
17287-79
1975
205,613
1976
132,147
The sole *318 issue [1] for decision is whether petitioner was availed of during its 1974, 1975, and 1976 taxable years for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed so that petitioner is therefore subject to the accumulated earnings tax imposed by section 531. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner, *319 Rhoades Oil Company, incorporated on December 5, 1947, is a corporation organized and existing under the laws of Delaware, with its principal place of business in Tulsa, Oklahoma. Petitioner timely filed U.S. Corporation Income Tax Returns (Forms 1120) with the Internal Revenue Service in Austin, Texas, for its 1974, 1975, and 1976 taxable years, reporting its income on a calendar year basis and utilizing the accrual method of accounting. Petitioner is a closely held corporation. During the years in issue, petitioner's common and preferred stock was owned as follows: No. of
Percent of
Common Stock
Shares
Ownership
Sam J. Rhoades, Sr.
305  51.0%
Nona M. Rhoades
147.5
24.5%
Sam J. Rhoades, Jr.
147.5
24.5%
Preferred Stock
No. of Shares
Sam J. Rhoades, Sr.
100
Nona M. Rhoades
50
Sam J. Rhoades, Jr.
50
During the years in issue, petitioner's officers were as follows: Sam. J. Rhoades, Sr.
President
Sam. J. Rhoades, Jr.
Vice-President and
Secretary
Nona M. Rhoades
Vice-President and
Treasurer
Frank R. Rhoades
Assistant Secretary
During the years in issue, Sam J. Rhoades, Sr., Sam J. Rhoades, *320 Jr., and Nona M. Rhoades also made up petitioner's board of directors. Nona M. Rhoades is the wife of Sam J. Rhoades, Sr. Sam J. Rhoades, Jr. is the son of Sam J. Rhoades, Sr. Frank R. Rhoades is the son of Sam J. Rhoades, Jr. Petitioner's principal business activity is the exploration for, development of, and production of hydrocarbons (i.e., oil and gas exploration and development). This is a high-risk business in which large amounts of money can be made or lost in a short period of time. Petitioner conducts these business activities by finding potential oil producing properties, placing them under lease, and then extracting the underlying oil for resale. Petitioner does not drill its own wells or own the necessary equipment therefor, nor has it ever done so. Instead, petitioner's oil wells are drilled entirely on an independent contract basis by "contract drillers." Likewise, petitioner does not own its own refinery, instead selling the crude oil extracted from its wells to various refineries. Most of petitioner's crude oil is sold to the major refineries in and around Oklahoma, although some portion of its crude oil is also sold to smaller refineries in the same geographical *321 region. Because of its method of operation, petitioner owns little equipment or other fixed assets. During the years in issue, all of petitioner's oil properties except a leasehold interest in certain property located in Alberta, Canada, were located in the continental United States. Most of these oil properties were located within Oklahoma, although petitioner also owned a few parcels of oil property in Missouri and Michigan that were not yet developed or in production. Petitioner's acquisition of a leasehold interest in a particular property begins with a recommendation to do so by its vice president, Sam J. Rhoades, Jr., a trained petroleum geologist. However, after a particular property is acquired, a considerable period of time, often several years, may elapse before any development of the property is undertaken. When development of a particular property actually commences, an exploratory test well is drilled. From an analysis of the results of the exploratory test well, the decision is made whether or not to engage in further development of the particular property by drilling more oil wells thereon. If an exploratory test is successful in finding oil, the investment of *322 money with respect to that particular property is immediately doubled or tripled due to the cost of drilling additional wells thereon, plus the cost of casings, pumping equipment, storage tanks, and other related equipment. Petitioner always hopes that each of the projects it undertakes will be productive and profitable, or it would not undertake the project in the first place. However, at any stage during the development of a particular property, events can occur which alter the planned development. The exploratory test on what is thought to be a promising oil property may produce a dry hole. Further, due to inaccurate estimates of underlying reserves, a once-promising property may not prove as productive as anticipated. Moreover, producing wells may simply stop producing. Also, a particular property may not be able to support as many oil wells as planned, leading to only a partial fulfillment of the planned development thereon. The occurrence of such a contingency can result in the curtailment or even complete termination of the project, with a resulting loss of any revenue being generated by such project. In contrast, certain properties may prove more productive than anticipated, *323 requiring an additional investment therein above and beyond that originally planned. An increase in production may generate greater revenues that can partially offset the costs of additional development, but such increased revenues may not be realized within the same year that the additional development expense is incurred. Also, the circumstances surrounding a particular project may require a more rapid development of the project than originally anticipated, accelerating the need for the funds required to finance such development. Other contingencies may also occur which drastically alter the development of an oil property. Uncontrollable forces of nature, blowouts, fires, or mechanical problems may occur. Petitioner has actually experienced such hazards in the past. Such hazards represent unforeseeable risks to which petitioner's business is inherently subject. The occurrence of such natural hazards can, and indeed often does, result in a complete loss of the investment on a particular project. Due to the unforeseeable nature of such hazards, it is difficult to anticipate and budget against their occurrence. The exploration for and development of oil and gas is a risky *324 business. During the years in issue, the OPEC [3] oil embargo also had a significant impact on petitioner's business. Due to the increase in foreign oil prices resulting from the embargo, the demand and search for domestic oil sources increased. Shortages of drilling equipment and trained personnel followed, often to the extent of rendering them virtually unavailable. As a result, the cost of drilling oil wells on a contract basis, as petitioner did, increased dramatically in these years. Petitioner self-finances all of its operations through its own earnings, rather than borrowing money to obtain operating capital. Petitioner's financial philosophy is a direct reflection of that of Sam J. Rhoades, Sr., the controlling shareholder, who was a "child of the Depression." [4] The goal of this financial policy was to prevent petitioner from becoming encumbered with any debts that might jeopardize its existence in a highly competitive and risky field. Petitioner's tax returns (Forms 1120) filed for its 1974, 1975, and 1976 taxable years do not reflect any outstanding debts in the form of mortgages, notes, or bonds payable. *325 At the end of each year, petitioner prepares an anticipated drilling budget for work expected to be performed in the coming year. However, this budget is not intended to be a strict limitation upon the expenditures for the next year, but rather to serve as a general guideline within which petitioner hopes to operate. Due to the business factors outlined above, such as development contingencies and rapidly increasing drilling costs, it is, and during the years here involved was, very difficult to arrive at a fixed drilling budget for the coming year. In addition, potential oil-producing properties are sometimes discovered unexpectedly during the course of a given year that must be drilled very rapidly, and such unexpected finds with their previously unbudgeted costs can throw off the year's anticipated drilling budget. As noted earlier, petitioner's only oil property outside of the continental United States is located in Alberta, Canada. That property is known as the Athabaska (also spelled Athabasca) Tar Sands project (hereinafter the Athabaska property), so named because of its close proximity to the Athabaska River. Petitioner is just one of many oil companies in the *326 world that have leases in the Athabaska region. Petitioner first began investigating oil properties in the Athabaska River region in 1953, but no lease was obtained with respect to any property at that time because petitioner did not have the necessary funds at that time. Although petitioner was then aware of the great potential for oil reserves underlying the Athabaska region, it felt no need to act hastily in acquiring a lease since none of petitioner's competitors were then engaged in oil exploration activities in the region. Further, the $50,000 cost of acquiring such a lease exceeded the amount petitioner was able to pay at that time. In 1957 or 1958, petitioner returned to the area and in conjunction with the Wood Oil Company[5] (hereinafter Wood) obtained a permit from the Canadian Government covering approximately 11,000 acres located in the Athabaska region, enabling them to conduct exploration activities for oil and gas on the land covered by the permit. Although the permit to explore (and later the lease to develop) was issued only in Wood's name, it was intended by and clearly understood between petitioner and Wood that each had a 50-percent undivided interest in *327 the Athabaska property covered by the permit and lease, and that petitioner would share in 50 percent of any costs, expenses, or income arising from the exploration and development thereof. As will be discussed later, the first lease was dated February 21, 1961, was for a 21-year term, and covered only 6,792 acres of the 11,000 acres originally covered by the permit. Extraction of the oil reserves underlying the Athabaska property poses a difficult problem.The oil is contained in the underlying bituminous sands (bitumen)--a thick, tarry substance with a high viscosity. As the bitumen is highly viscous, and therefore does not flow easily or at all, it is not possible to simply drill a well extending into the reservoir and pump the oil out by what a layman might refer to as "ordinary" oil-drilling procedures.This oil is so thick and heavy that it will not float on water as will most oil. A strip-maining method may be utilized, but is uneconomical as only about 10 percent of the underlying oil reserve *328 will be recovered by this process in that geographical area. Instead, petitioner and Wood wanted to use an insitu [6] process utilizing an "enhanced recovery" method for extracting "heavy oil," which would allow a greater percentage of the oil reserve to be recovered. In 1957, petitioner and Wood commissioned a Mr. Sylvan J. Pierson of the University of Texas to develop a process for the insitu recovery of hydrocarbons from the Athabaska tar sands and like properties. [7] Petitioner and Wood shared equally the cost on funding the research grant. In or around 1962, petitioner financed a patent application covering the extraction process developed by this study. The application was rejected, however, when it was discovered that an outstanding patent existed for the proposed extraction process. In fact, numerous extraction schemes for "heavy oil" had already been patented as of that time. However, because of the low price which any oil extracted from the Athabaska tar sands could be expected to bring and the relatively high fixed cost of these "heavy *329 oil" processes, utilization of any of these techniquest would not have been profitable at that time or at any time up to the present. In 1958, petitioner and Wood employed the consulting firm of Gallup, Buckland and Farney, Ltd. (hereinafter GBF), to conduct exploratory test drilling on their Athabaska property. Petitioner and Wood shared the exploration costs on an equal basis. In 1958, 1959, and 1961, GBF drilled a total of 8 test holes at various points on the Athabaska property. GBF analyzed samples from the test wells and submitted a report in February of 1961, detailing the geologic formation of the Athabaska property. The GBF report identified those areas of the Athabaska property found to have the thickest saturations of bituminous sands and, on the basis of that information, recommended areas in which to concentrate lease selection. On February 21, 1961, petitioner and Wood obtained a lease from the Canadian Government with respect to almost 7,000 of the acres covered by their previous permit. *330 Again, although the lease was nominally between only the Canadian Government and Wood, it was intended by and clearly understood between petitioner and Wood that petitioner owned a 50-percent undivided interest in the lease and all costs, expenses, and income arising therefrom would be shared equally. The original term of the lease was 21 years from the date of execution, renewable for further terms of 21 years each upon certain conditions. The stated rental under the lease was 25 cents of Canadian money per acre per annum for the first five years and $1 of Canadian money per acre per annum for the balance of the term. [8] In return petitioner and Wood received the ". . . exclusive right to mine, quarry, work, remove, treat and process bituminous sands including the recovery of any products therefrom whether above or below the surface . . . together with the right to dispose of bituminous sands and any products recovered therefrom." *331 The lease also contained the following provision: 4. That the lessee within one year from the date upon which the lessee is given notice by the Minister to do so, shall commence the construction of a plant or other works which upon completion shall have a minimum capacity to process . . . ten thousand . . . tons of bituminous sands a day or to extract from the sands . . . ten thousand . . . barrels of products a day and shall complete the plant or other works and place the same in operation within four years from the date of the notice by the Minister, and thereafter shall carry on the processing of the bituminous sands or extraction of products diligently to the satisfaction of the Minister. The notice by the Minister shall not be given until the expiration of one year from the date hereof. This was a standard provision in leases in the Athabaska region, and if given such notice the lessee had to commence plant construction within a year or terminate the lease. Up to the present time, the Canadian Government has never exercised any of the rights it possesses under this provision of petitioner's lease or under such a provision in any of the other leases in the Athabaska area. *332 In 1964 petitioner formed a Canadian corporation named Canadian Rhoades Oil Ltd. (Canadian Rhoades), under the laws of the Province of Alberta, Canada. [9] Petitioner owns all of the 150 shares of issued and outstanding stock of Canadian Rhoades except for one share which is owned by a Canadian resident. The officers of Canadian Rhoades were the same as those of petitioner. Canadian Rhoades was formed for the purpose of conducting petitioner's share of any development of the Athabaska property which might occur at some future time. On December 2, 1964, Wood transferred an undivided 50-percent interest in the lease covering the Athabaska property to Canadian Rhoades. The transfer was actually just a technical one, made in formal recognition of petitioner's previously existing 50-percent interest in the lease under the agreement between petitioner and Wood. During the 1960's petitioner continued to investigate insitumethods of *333 extracting oil from the Athabaska property. In the mid-1960's, the major oil companies moved into the Athabaska region. Some 4,000,000 acres of land in the Athabaska region were under lease or permit, and substantial research was being conducted on how to extract oil from the Athabaska tar sands. In the 1960's petitioner's vice president, Sam J. Rhoades, Jr., made several trips to a Canadian plant operated by the Amoco Refining Company on land near petitioner's Athabaska property to observe a field test and research connected with an insitu process being developed by Amoco. However, the process developed by Amoco was not considered economical by petitioner's officers at that time. Indeed, at no time up to and including the trial of this case has the Amoco process been considered economical by petitioner's officers. The Amoco process which was developed and operated under a grant from the Canadian Government has never been an economically successful operation. In 1973, petitioner commissioned John P. Barton, Jr., a petroleum geologist and consultant, to conduct a study of the possible methods of producing oil from and the estimated cost of developing petitioner's Athabaska property. *334 The study was conducted, and on June 28, 1973, Mr. Barton submitted a report detailing his findings to petitioner. Wood did not share in any expenses of the 1973 Barton report. In preparing his 1973 report, Mr. Barton utilized the data that had been produced by the 8 test wells drilled on the Athabaska property in 1958, 1959, and 1961. No additional field testing was undertaken, and Mr. Barton never visited the Athabaska region. Mr. Barton felt that the existing data was sufficient to satisfy the purposes of his study. Mr. Barton then researched the available literature on different types of "heavy oil" recovery processes, including a copy of a detailed report on Amoco's Canadian field test and related research. From this research, Mr. Barton concluded that the recovery process developed by Amoco was best suited to petitioner's needs from a technological viewpoint. Essentially, the 1973 Barton report is merely an adaptation of Amoco's process to petitioner's Athabaska property. The insitu recovery method developed by Amoco is known as the Cofcaw Process, and involves a combination of forward combustion and waterflooding. Basically speaking, the Cofcaw Process involves heating *335 the bitumen underlying a particular development area of the property in order to raise the temperature thereof and reduce its viscosity, increasing the flow rate of the bitumen. The development area consists of a 40-acre production unit, which is further broken down into 4 separate "ten acre nine spot well patterns." An "injection" well is drilled in the center of each 10-acre tract, with 8 "producing" wells drilled on the outlying boundaries thereof. The underlying bitumen is then ignited through the injection well and allowed to burn, which raises its temperature to the desired level after a period of time, approximately one year. Air and water are then pumped into the reservoir via the injection well, serving to force the heated bitumen out toward the outer production wells through which the heated bitumen is recovered. Utilizing the data from the 1961 GBF report and certain assumptions related thereto, [10] along with certain conclusions drawn from the Amoco report, the 1973 Barton report then proposes a fairly detailed plan for development of petitioner's Athabaska property using the Cofcaw Process.Among other things, the 1973 Barton report contains estimates of the underlying *336 reserves and the recoverable portion thereof, the bitumen saturation and depth of burial thereof, and also information concerning the amounts of air and water to be used in the extraction process. A proposed development schedule is provided, including recommendations on the order in which certain areas of the total acreage covered by petitioner's lease should be developed. Specifications as to the recommended depth and diameter of the injection and production wells are included. Descriptions of various other support equipment, such as water disposal facilities, are provided. Estimates of the projected life of the total project and development costs are incorporated. Development costs are estimated at $6,526,500 for the first seven years of operation. The report is replete with charts, graphs, and tables depicting the information set out therein. *337 The 1973 Barton report contains a sufficiently complete plan that could reasonably be used to begin development of petitioner's Athabaska property utilizing the Cofcaw Process. However, the fixed costs of initiating the Cofcaw Process represent a large initial investment prior to obtaining any return thereon. This factor, coupled with the low market price of oil produced from the Athabaska tar sands, precluded profitable development of petitioner's Athabaska property during its 1974, 1975, and 1976 taxable years. At no time since the 1973 Barton report was submitted and up to and including the trial of this case have petitioner's officers considered in profitable to begin development of the Athabaska property utilizing the Cofcaw Process. In 1974, the Canadian Government announced that it was setting aside approximately $100 million initially and another $300 million later to aid in the development of new technology for the recovery and processing of oil from the Athabaska tar sands. Successful applicants received a grant from the Canadian Government equal to 10 to 50 percent of the estimated cost of their project. The grants were only available for novel extraction processes. *338 Petitioner applied for a research grant in connection with its Athabaska property but its application was rejected since the proposed extraction method, the Cofcaw Process, was not a novel process, having been the subject of the previous field test by Amoco which had already been funded and was continuing to be funded by the Canadian Government. During 1977 through June of 1982 petitioner, pursuant to the requests of the Alberta Provincial Government, did engage in the development of a "five-year work program cycle" pertaining to its Athabaska property. The purpose of the program was to recommend a plan for the five-year development of land in the Athabaska region. In developing the cycle, petitioner relied exclusively on data obtained from the test wells drilled in 1958, 1959, and 1961, concluding that further testing would not add to the data previously obtained from such tests. During the study, petitioner researched insitu methods of extraction, conducted environmental studies, and also visited several project sites. While the record is scant as to the exact nature of the study, it appears that petitioner's obligations thereunder were satisfied by the submission of three *339 reports to the Government of the Alberta Province, detailing the results of petitioner's study. One report was an economic analysis of the proposed program, the second was an environmental study thereof, and the third was a report prepared by John P. Barton in 1978, detailing the recommendations for development of the Athabaska property. Other than minor changes resulting from changing the size of the recommended production unit from 40 acres to 80 acres, the 1978 Barton report is basically the same as his 1973 report. In essence, petitioner's development of a "five-year work program cycle" seems to have been in part a rehash of its earlier work in the area and in part continuing investigation of literature pertaining to insitu recovery methods. Since 1961, no further physical development has taken place on petitioner's Athabaska property. No new wells have been drilled, nor have any plant facilities been placed thereon. Although petitioner's officers have tried to keep abreast of current research involving insitu recovery methods, nothing has been found up to and including the date of the trial herein which could, in their opinion, be used to profitably develop the Athabaska *340 property. Petitioner's officers have at no time established an anticipated date to commence development of the Athabaska property, choosing to wait until it appears profitable to do so. Specifically, as of the end of its 1974, 1975, and 1976 taxable years, petitioner had no anticipated date to commence development of its Athabaska property. When asked to name an anticipated date for the commencement of development on the Athabaska property, Sam J. Rhoades, Sr., petitioner's president, candidly responded: It could be two years or it could be 20 years or 30 years. When the right process comes along and when the right price comes along that you can drill the well and operate it at a profit, then that day, it would become reality. That might be five years from today or it may be tomorrow or 10 years. Despite this shortcoming, the Athabaska property remains the "prize gem" among petitioner's leased properties, and petitioner has every intention of maintaining its lease so that when development of the region begins it can participate. [11] Petitioner regards the Athabaska region as "the greatest reserve of oil that the world has ever known, including the Middle East." Many large *341 oil companies have leases in the region, and petitioner is one of the few small independent oil companies to have a lease there. While it "could be a life time" before the Athabaska region is developed, when and if development begins, petitioner will need large sums of money to develop its property there. To reflect this fact, the minutes of petitioner's annual board of directors meetings for each of the years 1974, 1975, and 1976, respectively, directed petitioner's president to conserve and save all excess funds not needed for petitioner's domestic operations, such accumulations to be directed toward the future development of the Athabaska property. The minutes of the meeting for each year also directed the president to purchase "Class A stock, Treasury Bills, and Bank Certificates of Deposit" in hopes of further increasing the funds to be used in any future development of the Athabaska property. It was petitioner's intention in 1974, 1975, and 1976 to accumulate funds so that *342 it would be ready to move quickly if any breakthrough occurred in the Athabaska region. During the years in issue, petitioner was also involved in joint ventures with other oil companies, one of which was the Keener Oil Company (Keener) of Tulsa, Oklahoma. In 1974 and 1975 it was petitioner's desire to purchase Keener's interest. By letter dated December 15, 1975, petitioner offered to purchase Keener's 50-percent interest in an oil field that petitioner and Keener had recently finished drilling. Petitioner's vice president, Sam J. Rhoades, Jr., described this field as the most profitable petitioner had ever had. Petitioner was willing to pay approximately $4 million for Keener's 50-percent interest in the field. By letter dated December 29, 1975, Keener rejected petitioner's offer, informing petitioner that it was not interested in selling its 50-percent interest at that time but stating that if it later needed to seek outside funds it would give petitioner's proposition consideration. Apparently Keener never became interested in selling, but petitioner remained interested in acquiring Keener's interest at least through the years before the Court. During 1975 and 1976, petitioner *343 was also discussing with representatives of Wood the possibility of purchasing Wood's 50-percent interest in the Athabaska property. At some time in 1977, petitioner made an offer to purchase Wood's interest therein for approximately $1 million, but this offer was rejected by Wood. Wood had never previously expressed any desire to sell its interest in the Athabaska property, but petitioner was and continues to be interested in acquiring Wood's half interest.Apparently Wood regards its Athabaska lease as a desirable property to hold and while it has not set aside any fund to develop the property it has plans to obtain development funds whenever needed. In late 1973 and early 1974 petitioner, along with others, discovered oil on approximately 1,000 acres that was given the name of Whitebead Pool. The discovery was considered a major find by petitioner. Petitioner's interest in the Whitebead Pool was approximately 50 percent.Development of the property began in 1974. In its anticipated drilling budget for 1975, petitioner allocated the amount of $1.5 million to the Whitebead Pool. This figure represented only the anticipated development costs of petitioner's 50-percent interest *344 for 1975, and not the cost of any expenses petitioner's co-venturers might incur regarding their 50-percent interest. The actual cost of developing petitioner's 50-percent interest approximated $2,600,000 and was expended over a three-year period beginning in 1975. In the early part of its 1976 taxable year, petitioner became concerned that the prices it had been charging for oil violated Federal price constraints imposed thereon. Foreseeing a possible audit by the Department of Energy, petitioner hired an independent auditor to advise it as to whether it had indeed violated Federal price constraints and, if so, the potential liability therefor. The independent auditor confirmed petitioner's fears and informed it of the potential for a substantial repayment liability, which petitioner reasonably estimated to be $400,000. In the latter part of 1976, petitioner was in fact audited by the Department of Energy, resulting in a determination that petitioner had violated Federal price constraints. The auditor initially determined that petitioner had overpriced sales of its oil in the aggregate amount of approximately $600,000. By subsequent negotiations, the amount of the overcharge *345 was reduced to an aggregate figure of approximately $150,000 to $200,000 that petitioner thereafter repaid to its customers. Any overcharges determined to exist as a result of violating the Federal price constraints involved herein were not required to be repaid in a lump sum payment. Instead, pursuant to a "repayment plan," repayment was to be made by a reduction in the price charged on future sales of oil until the amount of the overcharge and interest thereon was repaid. Petitioner's officers were aware of the manner in which any repayment would be made. The parties agree that petitioner's operating cycle needs for the years in question were as follows: 1974
$235,285
1975
272,378
1976
364,745
The parties agree that other anticipated business needs of petitioner at the end of taxable year 1974 included the following drilling funds: Whitebead Pool
$ 750.000
Shell-Hopper
150,000
East Pauls Valley
100,000
Hilltop
65,000
Gray Pool
225,000
Wareing
50,000
Salt Water Disposal Well
40,000
Total
$1,380,000
The parties agree that petitioner's other anticipated business needs at the end of taxable years 1975 and 1976 included amounts *346 for the regular drilling budget of $1,435,000 and $1,345,000, respectively. Petitioner's balance sheets showed the following unappropriated [12] retained earnings for the years 1973 through 1976: Increase Over
Date
Retained Earnings
Prior Year
12-31-73
$3,413,828
12-31-74
[13] 4,716,702
$1,302,874
12-31-75
5,840,603
1,123,901
12-31-76
6,600,012
759,409
During the years 1967 through 1976 petitioner paid dividends on its common and preferred stock as follows: Year
Amount
1967
$33,000
1968
30,000
1969
13,540
1970
27,080
1971
13,540
1972
13,540
1973
16,040
1974
30,900
1975
30,000
1976
30,000
During the years in issue, petitioner had taxable income in the following amounts: 1974
[14] $1,403,352
1975
1,088,747
1976
628,614
*347 The following table depicts petitioner's net income after Federal income taxes for the years in issue: 1974
$742,300
1975
586,658
1976
332,982
The dividends paid by petitioner during its 1974, 1975, and 1976 taxable years represent approximately 4.2, 5.1, and 9.0 percent, respectively, of petitioner's net income after Federal income taxes for such years. During the taxable years in issue, the shareholders of Rhoades Oil Company reported taxable income on their personal income tax returns which placed them in approximately the following personal income tax brackets: Sam J. Rhoades, Sr.
Nona M. Rhoades
Year
Joint Income Tax Returns
Sam J. Rhoades, Jr.
1974
50%
32%
1975
50%
32%
1976
50%
32%
Petitioner's net liquid assets for each of the years in issue were as follows: 1974
1975
1976
Current Assets
Cash
$2,574,392
$1,781,460
$2,011,454 Trade Notes and
Accounts Receivable
363,116
2,974,516
565,664 Inventories
46,714
69,805
96,215 Investments: a) Government Obligations
770.382
2,824,694 b) Stocks and Bonds
757,282
768,760
768,760 Other Current Assets
8,216
8,682
8,437 Total Current Assets
$4,520,102
$5,603,223
$6,275,224 Current Liabilities
Accounts Payable
$ 287,803
$ 490,178
$ 472,541 Other Current Liabilities
61,190
1,445
[15] (219,406)
Total Current Liabilities
$ 348,993
$ 491,623
$ 253,135 Net Liquid Assets
$4,171,109
$5,111,600
$6,022,089 *348 On July 29, 1977, respondent, pursuant to section 534(b), sent petitioner a notification by certified mail informing it that a proposed statutory notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531 for the taxable year 1974. Pursuant to section 534(c), petitioner timely submitted, on September 26, 1977, a statement of the following grounds upon which it relies to establish that all or a part of its earnings and profits for the taxable year 1974 have not been permitted to accumulate beyond the reasonable needs of its *349 business: (a) the Commissioner, in determining the reasonable needs of the business erred by excluding the development costs of the taxpayer's Canadian Athabasca Oil Sands Lease #77 estimated at $6,000,000. (b) the Commissioner erred in reducing the estimated drilling cost of the Writebead Pool project from the $1,500,000 to $750,000 in determining the reasonable needs of the business. (c) the Commissioner, in determining the reasonable needs of the business, erred in refusing to recognize the risks peculiar to the industry as a basis for accumulating funds to provide for possible refunds to customers resulting from audits by the Federal Energy Administration (estimated at $400,000), the need to provide for development of fields in the event exploratory wells were successful (estimated at $4,437,750), to provide for shortages of oil field supplies, and to acquire partnership interests. On a separate schedule attached to its section 534(c) statement, petitioner listed "Development Contingency" as a separate item alleged to constitute a reasonable need of the business, assigning a dollar figure thereto of $1,500,000. On February 17, 1978 respondent mailed to petitioner a statutory *350 notice of deficiency for the taxable year 1974. On September 12, 1978, respondent, pursuant to section 534(b) sent petitioner a notification by certified mail informing it that a proposed statutory notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531 for its 1975 and 1976 taxable years. Pursuant to section 534(c), petitioner timely submitted, on December 7, 1978, [16] a statement of the following grounds upon which it relies to establish that all or a part of its earnings and profits for its 1975 and 1976 taxable years have not been permitted to accumulate beyond the reasonable needs of its business: (a) the Commissioner, in determining the reasonable needs of the business for each year, erred by excluding the development costs of the taxpayer's Canadian Athabasca Oil Sands Lease #77 estimated at $6,000,000. (b) the Commissioner erred by excluding the estimated cost of purchasing producing properties at a cost of not less than $4,000,000 in determining the reasonable needs of the business for the calendar year of 1975. (c) the Commissioner, in determining the reasonable needs of the business, erred in refusing: to recognize *351 the risks peculiar to the industry as a basis for accumulating funds, to provide for possible refunds to customers resulting from audits by the Federal Energy Administration (estimated at $400,000), the need to provide for development of fields in the event exploratory wells were successful in the North Keokuk Area, to provide for shortages of oil field supplies, and to acquire partnership interests. As shown on a separate sheet attached to its section 534(c) statement, those items pertained to both 1975 and 1976. On that separate sheet petitioner also listed "Development Contingency" as a separate item alleged to constitute a reasonable need of the business, assigning a dollar figure thereto of $1,500,000 in each of its 1975 and 1976 taxable years, respectively. On October 24, 1979, respondent mailed to petitioner a statutory notice of deficiency for taxable years 1975 and 1976. On June 1, 1981, petitioner filed a motion to shift the burden of proof pursuant to section 534 and Rule 142(e). After a hearing thereon, this Court, *352 by order dated April 1, 1982, granted petitioner's motion with respect to all grounds set forth in both of petitioner's section 534(c) statements, except the ground in both such statements dealing with the acquisition of partnership interests. Accordingly, the burden of proof with respect to that ground remains upon petitioner. [17]
*353 OPINION An accumulated earnings tax is imposed upon "every corporation . . . formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed." Secs. 532(a), 531. The ultimate question, upon which the corporate taxpayer has the burden of proof, [18] is whether a purpose of its accumulation was avoiding the income tax with respect to its shareholders (the "proscribed purpose"). United States v. Donruss Co.,393 U.S. 297 (1969). This is a question of fact. Atlantic Properties, Inc. v. Commissioner,519 F. 2d 1233, 1235 (1st Cir. 1975), affg. 62 T.C. 644, 656 (1974); American Metal Products Corp. v. Commissioner,287 F. 2d 860, 863-864 (8th Cir. 1961), affg. 34 T.C. 89 (1960); Kerr-Cochran, Inc. v. Commissioner,253 F. 2d 121, 124 (8th Cir. 1958), affg. a Memorandum Opinion of this Court. *354 The major factor in determining the applicability of the accumulated earnings tax is the taxpayer's reasonable business needs for accumulating its earnings and profits. See United States v. Donruss Co.,supra,393 U.S. at 307; Faber Cement Block Co. v. Commissioner,50 T.C. 317, 327 (1968).A determination of reasonable business needs is critical in two respects: (1) to compute the section 535(c) credit in calculating the accumulated taxable income, and (2) to decide whether the presumption of a tax-avoidance purpose under section 533 applies. If the taxpayer can show that all of its current earnings were accumulated for the reasonable needs of its business, there is no accumulated earnings tax since the accumulated earnings credit, section 535(c), eliminates the amount against which the tax is imposed. Chaney & Hope, Inc. v. Commissioner,80 T.C. 263, 281 (1983); Magic Mart, Inc. v. Commissioner,51 T.C. 775, 799 (1969); John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 474 (1965). Even *355 if the retention of all of its current earnings is not justified, the amount of the taxpayer's reasonable business needs is nonetheless necessary to property determine the section 535(c) credit. Whether a taxpayer's accumulation of earnings and profits is in excess of its reasonable business needs is also a question of fact. Helvering v. National Grocery Co.,304 U.S. 282 (1938). In determining the reasonable business needs of a corporation, we are reluctant to substitute our judgment for the business judgment of corporate management who are most familiar with the complexities and make-up of their corporation and its business, and we will not substitute our judgment unless the facts and circumstances compel our doing so. Atlantic Properties, Inc. v. Commissioner,supra; Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 329, and cases cited therein. A taxpayer's reasonable business needs include its reasonably anticipated business needs. Sec. 537(a)(1). Section 1.537-1(b)(1), Income Tax Regs., provides: *356 In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. In a closely held corporation, the type of corporation normally involved in an accumulated earnings case, it is not necessary that the "specific, *357 definite, and feasible" plans alleged in support of an accumulation be inscribed in formal minutes. Doug-Long, Inc. v. Commissioner,72 T.C. 158, 171 (1979); John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 469. And the taxpayer need not produce meticulously drawn formal blueprints for action. Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 332; John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 469. It is not sufficient, however, for the corporation merely to recognize a future need and discuss possible and alternative solutions concerning the same. Atlantic Commerce and Shipping Co. v. Commissioner,500 F. 2d 937, 940 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; Estate of Lucas v. Commissioner,71 T.C. 838, 853 (1979), affd. 657 F. 2d 841 (6th Cir. 1981). Definiteness of plan coupled with action taken toward the consummation thereof are essential. Dixie, Inc. v. Commissioner,277 F. 2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958), cert. denied 364 U.S. 827 (1960); *358 Doug-Long, Inc. v. Commissioner,supra,72 T.C. at 171; Estate of Lucas v. Commissioner,supra,71 T.C. at 853. In other words, "the intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose." Smoot Sand & Gravel Corp. v. Commissioner,241 F. 2d 197, 202 (4th Cir. 1957), affg. in part a Memorandum Opinion of this Court, cert. denied 354 U.S. 922 (1957). If there was the need and "the intention that it would be done in the regular course o business," that is sufficient. Oklahoma Press Publishing Co. v. United States,437 F. 2d 1275, 1280 (10th Cir. 1971). The test is whether the alleged plan appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations * * *" Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 332-333. A taxpayer's reasonably anticipated future business needs are determined on the basis of the facts at the close of the taxable *359 year. Breitfeller Sales, Inc. v. Commissioner,28 T.C. 1164, 1168 n. 4 (1957), and cases cited therein. Subsequent events may not be used to show that the retention of earnings or profits was unreasonable, but subsequent events may be considered to determine whether the taxpayer actually intended to consummate its plans for which its earnings and profits were allegedly accumulated. Sec. 1.537-1(b)(2), Income Tax Regs.; Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 333-334. In determining whether the earnings and profits of any taxable year have been accumulated beyond the reasonable needs of the business, it is necessary to consider whether accumulated earnings and profits of prior years were sufficient to meet the taxpayer's reasonable business needs (including reasonably anticipated needs) for the current year. Atlantic Properties, Inc. v. Commissioner,supra, 62 T.C. at 656. We do not, however, merely compare the total amount needed in the business with the taxpayer's total accumulated *360 earnings and profits. Rather, we look to the accumulated earnings and profits that are reflected in net liquid assets. Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975); Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d 495, 501 (4th Cir. 1960), cert. denied 362 U.S. 976 (1960), affg. a Memorandum Opinion of this Court; Montgomery Co. v. Commissioner,54 T.C. 986, 1008 (1970). As the Supreme Court said in Ivan Allen Co. v. United States,supra,422 U.S. at 628, "The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business." When accumulated surplus is retained in the form of liquid assets, it is available to meet business needs, and if sufficient to meet the current and reasonably anticipated future business needs of the corporation, there is a strong indication that any additional accumulation of profits of the current year is beyond the reasonable needs of the business. Atlantic Properties, Inc. v. Commissioner,supra, 62 T.C. at 656; Novelart Manufacturing Co. v. Commissioner,52 T.C. 794 (1969), *361 affd. 434 F. 2d 1011 (6th Cir. 1970), cert. denied, 403 U.S. 918 (1971); John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 467-468; sec. 1.535-3(b)(1)(ii), Income Tax Regs.
The fact that a corporation has accumulated its earnings and profits beyond its reasonable business needs raises a presumption that the accumulation was for the proscribed purpose, "unless the corporation by the preponderance of the evidence shall prove to the contrary." Sec. 533(a). For the accumulated earnings tax to apply, it is enough if the proscribed purpose is one of the purposes behind the accumulation, even if it is not the "dominant, controlling, or impelling" one. United States v. Donruss Co.,supra,393 U.S. at 301. Indeed, the taxpayer must show a complete lack of the proscribed purpose. Pelton Steel Casting Co. v. Commissioner,28 T.C. 153, 174 (1957), affd. 251 F. 2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958). With the foregoing principles *362 in mind, we turn to an evaluation of petitioner's alleged business needs, beginning with those grounds alleged in petitioner's section 534(c) statement as to which respondent has the burden of proof in this case. While some of the factual issues are rather close, respondent simply has not persuaded us and has failed to carry his burden of proof. While the decisional law furnishes us many guidelines and virtually innumerable cases can be cited for the various legal propositions, the inquiry nonetheless remains quintessentially a factual one. Reasonable business needs cannot be determined in a vacuum or out of the context of the given business or industry. In evaluating petitioner's reasonable business needs, we must keep in mind the nature of petitioner's particular business and the business environment in which it operated. Petitioner is a small independent company in the highly competitive and risky business of exploration for, and development of, gas and oil properties. In its particular business operation--exploring for and leasing potential oil and gas properties, hiring independent contract drillers to drill the wells on the properties so leased, and selling the crude *363 oil to refineries--petitioner had little equipment or other fixed assets but needed large amounts of money to be able to move when opportunities presented themselves. And in its particular business operation, petitioner is and has always been self-financing. Petitioner does not acquire a property until it has accumulated the funds for the purchase and petitioner frequently holds a leased property for several years before it begins development; also once development begins, if the test well proves to be successful, the funds needed for further development can immediately double or triple the amounts that were reasonably estimated for the drilling budget. In the gas and oil industry in which petitioner was competing, the period before the Court--the years 1974, 1975, and 1976--was an unsettled time with the recent OPEC oil embargo, rapidly increasing demands for gas and oil products, rapidly increasing prices for oil products, a rush to explore for new gas and oil reserves, and rapidly accelerating prices for equipment, supplies, and personnel needed in the business of gas and oil exploration. It is against this background that petitioner's reasonable business needs must be measured. *364 A. Price Refund Contingencies.
Petitioner contends that during these years it feared a potential repayment liability due to exceeding Federal price constraints on sales of its crude oil and that respondent has failed to establish that it was unreasonable for petitioner to accumulate $400,000 of its earnings and profits to meet this "contingent" liability. We have previously recognized contingent liabilities as reasonable business needs which justify an accumulation if the likelihood (not merely the remote possibility) of its occurrence would appear to a prudent business firm. Smoot Sand & Gravel Corp. v. Commissioner,supra,241 F. 2d at 206; Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 586 (1965). Compare J. Gordon Turnbull, Inc. v. Commissioner,41 T.C. 358, 374-375 (1963), affd. 373 F. 2d 87 (5th Cir. 1967). Here there was a reasonable likelihood and not merely a remote possibility that this liability would occur. We think this was a realistically foreseeable contingency that a prudent business *365 person would try to guard against. In fact the liability did subsequently develop. In the early part of 1976, petitioner hired an independent auditor to advise it as to whether it had in fact violated Federal price constraints and, if so, the potential liability therefor. That auditor confirmed petitioner's fears and informed it of the potential for a substantial repayment liability. Petitioner reasonably estimated the repayment to be $400,000. In the latter part of 1976 petitioner was in fact audited by the Department of Energy and found to have violated Federal price constraints. The Federal auditor estimated the liability at $600,000. Fortunately for petitioner, in years subsequent to those before the Court, the amount was negotiated down to $150,000 to $200,000. However, for the years before the Court it was reasonable for petitioner to retain an amount of $400,000 for this contingent liability. Respondent emphasizes the fact that any repayment did not have to be made in the form of a lump-sum amount. Instead, the amount that petitioner could charge on future sales of oil had to be reduced until the amount of the overcharges and interest thereon had been repaid. However, *366 we think a prudent business person would reasonably set aside funds for such a contingent liability, even if repayment could be made through reduced sales prices in the future. Otherwise the business would be forced to gamble on future prices and future expenses and its future financial health might be jeopardized by this past liability or at least any future profits would be reduced by this repayment. B. Development of Whitebead Pool.
In preparing its anticipated drilling budget for the coming year of 1975, petitioner at the end of 1974 allocated an amount of $1,500,000 to the development of its 50-percent interest in the Whitebead Pool, an oil field discovered by petitioner and others in late 1973 and early 1974. Actual development of the Whitebead Pool began in 1974 and the oil field was considered a major prospect by petitioner. As it turns out, petitioner actually spent approximately $2.6 million on development of the Whitebead Pool over roughly a three-year period. In his notice of deficiency, respondent accepted $750,000 of the $1,500,000 allocated to development of the Whitebead Pool in 1975 as a reasonably anticipated business need for petitioner's 1974 taxable *367 year. In doing so, we think respondent was acting partially under the mistaken impression that the $1,500,000 figure represented the development cost of the entire Whitebead Pool project to petitioner and its joint venturers. However, all the evidence of record is clearly to the contrary. The $1,500,000 figure represented only the cost of developing petitioner's 50-percent interest in Whitebead Pool, and not that of all parties involved therein. Furthermore, respondent also contends that the $1,500,000 figure represented amounts to be expended over a three-year period of development, rather than just in taxable year 1975. However, we think respondent's contention in this regard is based on an erroneous reading of the trial transcript herein. The $1,500,000 figure was the amount anticipated to be spent on development of the Whitebead Pool in 1975. While a separate portion of the transcript does make reference to monies being spent on the Whitebead Pool project over a three-year period, a careful reading thereof reveals this testimony to be in response to the Court's question as to whether the $2.6 million actual cost of developing the Whitebead Pool had also been spent within *368 one year, and not as to whether the $1.5 million anticipated drilling budget covered a three-year period rather than the immediately succeeding year, 1975. Finally, respondent contends that the full amount of $1,500,000 should not be allowed as a reasonably anticipated business need for 1974, pointing out that as wells in the Whitebead Pool project became productive during 1974, newly generated revenues therefrom could be used to finance additional development on this project. However, respondent has offered no evidence to indicate that the $1,500,000 figure did not already take into account the expectation of additional revenue from producing wells on the Whitebead Pool project. The record shows that at least three wells were ultimately drilled at a cost of $2.6 million to petitioner. In light of the above, and with proper regard for the business judgment of petitioner's corporate management, Atlantic Properties, Inc. v. Commissioner,supra, 62 T.C. at 656; Faber Cement Block, Co. v. Commissioner,supra,50 T.C. at 329, we conclude that respondent has failed to carry his burden of proof with respect to the Whitebead Pool project. Accordingly, *369 the figure of $1,500,000 allocated to the development thereof in 1975 constituted a reasonably anticipated business need for petitioner's 1974 taxable year. C. Risks Peculiar to the Industry; Development of Fields where Exploratory Wells are Successful; Shortages of Oil Field Supplies.
Although paragraph (c) of both of petitioner's section 534 statements separately stated the above grounds for accumulating earnings and profits in taxable years 1974, 1975, and 1976, we think it proper to consolidate them for purposes of our opinion herein. Indeed, we think petitioner has in fact done so in both section 534 statements as well as on brief, referring to such combined grounds as "development contingencies," and assigning a dollar amount thereto of $1,500,000 for each of its taxable years 1974, 1975, and 1976, respectively. Accordingly, we will refer to these grounds collectively herein. Respondent first contends that these "development contingencies" are too vague and uncertain to constitute reasonably anticipated business needs, citing as evidence thereof petitioner's alleged failure to assign a specific dollar amount to each of the separately stated grounds of risks peculiar *370 to industry, development of fields where exploratory wells are successful, and shortages of oil field supplies. However, we think respondent's argument must be rejected. While petitioner did not assign a separate dollar figure to each of these three separately stated grounds, both of petitioner's section 534 statements list the category of "development contingencies" and assign a $1,500,000 figure thereto for each year in issue. Further, we have found herein that the category, "development contingencies," was merely a consolidation of these three separately stated grounds, the $1,500,000 representing the aggregate anticipated amount thereof for each year in issue. Thus, petitioner has in fact assigned a dollar figure to such contingencies. This fact, viewed in connection with the uncontroverted testimony herein that these sorts of contingencies have actually occurred in petitioner's business, refutes respondent's argument that such contingencies are too uncertain and vague to constitute reasonably anticipated business needs. Respondent next contends that such "contingencies" are already provided for in petitioner's anticipated drilling budget for the coming year. In a somewhat *371 related argument, respondent also asserted that the $1,500,000 figure for each year should be reduced to reflect increased revenues from newly producing wells. However, respondent has not demonstrated that such costs were included in the anticipated drilling budget, nor has he proven that the $1,500,000 figure for each year did not already reflect any anticipated increase in revenues from new production. Thus, we must reject respondent's arguments. Respondent also contends that petitioner had no "specific, definite, and feasible plans" for the use of any accumulation for "development contingencies" within the meaning of section 1.537-1(b)(1), Income Tax Regs. Asserting that such development contingencies are vague and uncertain, respondent apparently contends that as petitioner cannot point to a specific fugure occurrence of a "development contingency" upon which the accumulations at issue herein would be utilized, petitioner's plans with respect thereto cannot be considered "specific, definite, and feasible" within the meaning of the above cited regulation. However, any such argument simply misconstrues the meaning of the regulation. Fires, blowouts, *372 mechanical problems, and dry holes are self-explanatory; the need for additional funds once the test well proves successful is clear; and the need to meet equipment and personnel shortages is likewise clear. As the detailed testimony of petitioner's president and vice president amply illustrates, these development contingencies cannot be particularized in advance but must be handled as they arise, and they did arise in the business. As we have said, the test is a practical one, namely whether the anticipated business need appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations * * *" Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 332-333. Viewing all of the evidence as a whole, we think the accumulation of funds to protect against the occurrence of such development contingencies was a real consideration during the years in issue. Certainly, respondent has not proven the contrary. Therefore, we do not think petitioner's "plans" to accumulate current earnings and profits to protect against "development contingencies" fail to qualify as "specific, definite, and feasible" *373 within the meaning of section 1.537-1(b)(1), Income Tax Regs.We would be particularly loathe to substitute our judgment for that of petitioner's management in this area, and respondent has not presented any evidence that requires us to do so. Respondent further contends that at least any accumulation to cover shortages of oil field equipment should be viewed as unreasonable. As we understand respondent's argument, it is based on testimony of petitioner's officers to the effect that the demand for new sources of domestic oil production following the OPEC oil embargo was so great that drilling equipment and trained personnel were often rendered unavailable. Respondent then asserts that since such drilling equipment and personnel were unavailable, there was nothing upon which any accumulation could be spent and, therefore, no reasonable need for the accumulation. However, there is no evidence of record that indicates that any period during which such drilling equipment and personnel were unavailable was anything other than temporary. There is certainly nothing to indicate that any such period lasted throughout the entire duration of any year at issue herein. *374 We do not think the periodic unavailability of drilling equipment and personnel serves to totally negate the need to accumulate funds to provide therefor when they do become available. Further, we think the fact such equipment and services became periodically unavailable further supports petitioner's argument that accumulations of the size involved herein were needed to meet rapidly inflating costs due in part to such shortages. In light of the above, and again with proper regard for the business judgment of petitioner's corporate management, Atlantic Properties, Inc. v. Commissioner,supra, 62 T.C. at 656; Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 329, we conclude that respondent has failed to carry his burden of proof with respect to the separately stated grounds of risks peculiar to the industry, development of fields where exploratory wells are successful, and shortages of oil field supplies, referred to collectively herein as "development contingencies." Accordingly, we hold that the amount of $1,500,000 constituted a reasonably anticipated need of petitioner's business in each of the years at issue herein. D. *375 Athabaska Tar Sands Project.
Petitioner contends that development of the Athabaska property constituted a reasonably anticipated future need of its business justifying an accumulation of $6 million. [19] Respondent's position is that petitioner had no "specific, definite, and feasible" plan for the development of the Athabaska property within the meaning of section 1.537-1(b)(1), Income Tax Regs., and thus the development thereof cannot form the basis for an accumulation of petitioner's current earnings and profits. Respondent also argues as a separate basis precluding an accumulation of current earnings and profits that any "plan" petitioner might have had was "postponed indefinitely," within the meaning of section 1.537-1(b)(1), Income Tax Regs.
*376 In response to respondent's argument that there was no "specific, definite, and feasible" plan for development of the Athabaska property, petitioner directs our attention to the 1973 Barton report. In our findings of fact herein, we have set out in some detail the contents of the 1973 Barton report. We also specifically found as a fact that such report contains a sufficiently complete plan that could be used to begin development of the Athabaska property utilizing the Cofcaw Process. However, the fact remains that up until the trial of this case petitioner still had not begun such development. The evidence of record regarding any proposed development of the Athabaska property repeatedly underscores one major point: At no time since the acquisition of the lease covering the Athabaska property in 1961 up to and including the present time has it been possible to commence profitable development of such property, and petitioner's officers were then and still are fully aware of this painful economic fact of life. This is especially true of development of the Athabaska property utilizing the Cofcaw Process which, at all times since the development of such process, has been considered *377 "uneconomical" by petitioner. The initial investment costs demanded by any of the insitu recovery methods petitioner studied, including the Cofcaw Process advocated by the 1973 Barton report, were simply too great when compared with the price per barrel for oil extracted from the Athabaska property and the lengthy period of time that would elapse before any oil production from wells drilled on the Athabaska property would begin. Further, it is abundantly clear from the record that the inability to profitably develop the Athabaska property was the sole reason why such development has not begun. It is equally clear that petitioner's officers had and have no reasonable estimate as to when it may be possible to profitably develop the Athabaska property. It is easy to understand petitioner's inability to give the Court such a date at the trial: The ability to profitably develop the Athabaska property depended and still depends largely upon factors beyond petitioner's control--i.e., a sufficient increase in the price of oil extracted from the Athabaska property and/or development of a less expensive method for the recovery thereof. The most that can now be said, with the benefit of *378 a decade of hindsight, is that petitioner was and is holding on to the Athabaska property, hoping to one day undertake profitable development thereof. Nevertheless, the controlling test remains whether development of the Athabaska property appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations * * *" Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 332-333. We are satisfied that development of the Athabaska property was a "real consideration" during each of the taxable years at issue. We think that respondent overemphasizes the matter of a "specific, definite, and feasible" plan and the argument that any such "plan" was "postponed indefinitely" within the meaning of section 1.537-1(b)(1), Income Tax Regs. Respondent tries to convert these useful guidelines into a litmus test or determinative legal factor as to what constitutes a reasonable business need. That the Athabaska Tar Sands project has not yet been developed does not necessarily mean that petitioner in 1974, 1975, and 1976 did not intend to do it and did not accumulate funds for that *379 purpose. Again, this claimed anticipated future business need must be evaluated in the context of the nature of petitioner's business and the business environment in which it was operating during the years before the Court. The Athabaska Tar Sands project is both like and unlike petitioner's other oil projects. It is like its other projects in that petitioner waited until it had accumulated funds before it obtained the permit and later the lease (from about 1953 to 1958 and 1961), that petitioner planned to hold the lease (21-year lease plus renewals) for several years before it began development, and that petitioner planned to self-finance the project and to accumulate funds over a period of years for that purpose. The Athabaska Tar Sands project is unlike petitioner's other oil properties in that it involves tar sands or bitumen rather than a fluid oul deposit and in that it involves nonexistent or as yet unproven technologies for recovery of oil from the bitumen. While there are numerous theoretical processes for "heavy oil," "enhanced recovery" methods, thus far only Amoco's Cofcaw Process seems promising. The Amoco project in the Athabaska region has been heavily funded *380 in part by the Can dian Government, but still has not become an economical operation, as we now know. We must examine the facts as petitioner knew them back in 1973-1976. In 1973 there were major oil companies from around the world with some 4,000,000 acres under lease in the Athabaska region. Petitioner, a small independent oil company, had a 50-percent interest in a lease of almost 7,000 acres. In 1973 petitioner commissioned the Barton study which recommended use of the Cofcaw Process and estimated development costs at over $6.5 million for the first seven years. Petitioner's lease contained the standard "command performance" clause, whereby the Canadian Government could give the lessee notice that within one year the lessee must begin construction of a plant meeting certain production levels and that the plant must be completed within four years from the time of the notice. Granted the Canadian Government had never exercised its rights under that clause, but this was 1973, the year of the OPEC oil embargo. The OPEC oil embargo created oil shortages, raised the price of oil drastically, set off a general inflationary spiral, and provided impetus for development of new oil *381 reserves and alternative energy sources. In 1974 the Canadian Government began funding research projects in the Athabaska region to try to develop new recovery methods to spur development of the bitumen in the region. Petitioner could not obtain a research grant because the method it was proposing, the Cofcaw Process, was not new and had already been developed with funding from the Canadian Government. In that historic frame of reference, in 1974, 1975, and 1976, we think petitioner reasonably believed that either new technology would come along to make development of its Athabaksa property economically viable or oil prices would escalate sufficiently to make it worthwhile to go forward with the Cofcaw Process. As shown by the minutes of the meetings of its board of directors in those three years, petitioner began to try to accumulate funds for its Athabaska project. [20] To the extent that petitioner retained any accumulated earnings not otherwise required for other business needs in 1974, 1975, and 1976, the Court is satisfied that any such accumulation was for the purpose of developing the Athabaska project. We cannot find that it was unreasonable for petitioner to accumulate *382 any funds it could looking toward the development of its Athabaska project. [21] Some deference is owed to the corporate management of a small independent oil company trying to cope in the period after, and in the midst of the shock waves, of the 1973 OPEC oil embargo. *383 In light of the above, we think that development of the Athabaska property constitutes a reasonably anticipated business need during petitioner's 1974, 1975, and 1976 taxable years. In an industry as volatile as the gas and oil business in those years, we would be loathe a decade later to second-guess corporate management as to its reasonable business needs for developing tar sands as an oil source. Respondent, who bears the burden of proof on this claimed business need, has neet carried his burden. E. Purchase of Producing Properties/Partnership Interests During 1975 and 1976.
In our Order of April 1, 1982, the burden of proving that purchase of producing properties and acquisition of partnership interests constituted a reasonable business need for taxable years 1975 and 1976 was left with petitioner. See footnote 17 above. In our opinion, petitioner has carried its burden of proof in part and failed to carry it in part. During the years before the Court, petitioner wanted to buy Keener's 50-percent interest in an oil field they had jointly developed. Petitioner regarded the field as the most profitable it had ever developed, and was willing to pay $4,000,000 for *384 Keener's interest. By letter dated December 15, 1975, petitioner offered to purchase Keener's interest but Keener rejected the offer by its letter of December 29, 1975. While Keener rejected petitioner's offer, it stated that if it later needed to seek outside funds, it would give petitioner's proposition consideration. Apparently Keener never changed its mind, but petitioner remained interested in such an acquisition at least through the years before the Court. During 1975 and 1976, petitioner was also discussing with representatives of Wood the possibility of purchasing Wood's 50-percent interest in the Athabaska property. At some point in 1977, petitioner made an offer to purchase Wood's interest for approximately $1,000,000. Wood rejected the offer. Petitioner regards its Athabaska property as the "prize gem" among its leased properties, and Wood also regards its Athabaska lease as a desirable property to continue to hold. Wood has never been interested in selling its 50-percent interest in the Athabaska property, but petitioner was and continues to be interested in purchasing it. Its efforts to purchase these properties having failed, petitioner at some point must be *385 deemed to have abandoned any plan to acquire them. In other words, petitioner cannot continue indefinitely to accumulate or retain its earnings for these purchases, no matter how cherished its desire to acquire these properties and no matter how reluctant it may be to give up all hope of acquiring them.The question is whether the point had been reached during the years before the Court. We conclude that the proposed purchase of Keener's 50-percent interest was a reasonably anticipated business need for 1975 but not for 1976 While we accepted the testimony of petitioner's officers as to their continuing interest in the Keener property, they have not satisfied the Court that they had any reasonable basis to continue to entertain any further hope in that regard by the end of 1976. We also conclude that the proposed purchase of Wood's interest in the Athabaska property was a reasonable business need for 1976 and up until Wood's rejection of the offer in 1977. In summary, based on the parties' stipulations and our holdings avove, petitioner's reasonable business needs for the years in issue are as follows: 1974
1975
1976
Price Refund Contingencies
$ 400,000
$ 400,000
$ 400,000
Whitebead Pool
[22] 750,000
Development Contingencies
1,500,000
1,500,000
1,500,000
Athabaska Tar Sands Project
[23] 1,500,000
Acquisition of Partnership Interests
4,000,000
1,000,000
Operating Cycle Needs
235,285
272,378
364,745
Anticipated Drilling Budget
1,380,000
1,435,000
1,345,000
Total:
$4,265,285
$7,607,378
$6,109,745
*386 Petitioner's reasonable business needs, including reasonably anticipated needs, for the years in issue, compared to petitioner's accumulated earnings and profits, as reflected in net liquid assets, produce the following results: Year Ending
12-31-74
12-31-75
12-31-76
Accumulated Earnings
and Profits
$4,716,702 $5,840,603 $6,600,012 Net Liquid Assets
Available to Meet
Anticipated Business Needs
4,171,109 5,111,600 6,022,089 Total Needs of Business
4,265,285 7,607,378 6,109,745 Excess of Liquid Assets
Over Needs
($ 94,176)
($2,495,778)
($ 87,656)
In other words, petitioner did not retain or accumulate its earnings beyond its reasonable business needs. *387 Inasmuch as the foregoing chart indicates that petitioner's business needs exceeded its net liquid assets for each of the years 1974, 1975, and 1976, we need not consider whether petitioner was availed of for the proscribed purpose in those years. [24]John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 474. This is so because the accumulated earnings credit provided for in section 535(c) would be equal to the full amount of petitioner's current earnings and profits retained in those years, thus resulting in accumulated taxable income equal to zero. We, therefore, hold that petitioner is not liable for accumulated earnings taxes in any of the years 1974, 1975, and 1976. See Chaney and Hope, Inc. v. Commissioner,supra.80 T.C. at 281 and cases cited therein.
*388 To reflect petitioner's concession and the above holdings, Decisions will be entered under Rule 155.
Footnotes
1. Petitioner has conceded that expenditures of $3,508 made on behalf of its principal shareholder during its 1974 taxable year were constructive dividends rather than ordinary and necessary business expenses as originally claimed on its 1974 tax return (Form 1120). In computing petitioner's accumulated taxable income for 1974 respondent deducted this $3,508 along with the cash dividends paid that year. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Organization of Petroleum Exporting Countries.↩
4. Sam J. Rhoades, Sr.'s financial philosophy is the result of having lived through the Great Depression, during which time he not only suffered personal financial losses, but saw the same fate befall several of his friends and business acquaintances. These experiences left Sam J. Rhoades, Sr. with a pronounced distaste for relying upon borrowed funds. However, we note that in 1958 a loan in the approximate amount of $970,000 was obtained and utilized to buy out the interest of a deceased shareholder in petitioner who was not a Rhoades' family member. The loan was repaid in 1961 or 1962. The record does not indicate whether such loan was obtained by petitioner or by Sam J. Rhoades, Sr., but the money was borrowed from a close friend of Mr. Rhoades, Sr. If the loan was obtained by the company, it represents the last instance of any borrowing by the company.↩
5. Wood Oil Company was incorporated under the laws of Oklahoma, with its principal place of business during the years in issue located in the City of Edmonton, Alberta, Canada.↩
6. As used herein, insitu refers to the extraction of oil without removing the overburden (rock, etc.) that covers the bitumen.↩
7. Similar tar sands can be found in the State of California, but the oil in the California tar sands is of a somewhat better quality than that in the Athabaska region.↩
8. The lease also called for certain royalty payments upon the products derived from the bituminous sands and from the sale or other disposition of the bituminous sands in their raw form, without processing or treatment. As there has been no development of petitioner's Athabaska property beyond the exploratory wells drilled thereon, it appears no liability for these royalties has ever arisen.↩
9. Although the parties stipulated that Canadian Rhoades was formed on December 2, 1974, that is clearly a typographical error and should have been 1964.↩ The transfer agreement between Wood and Canadian Rhoades was dated December 2, 1964.
10. For example, Mr. Barton assumed that the geologic characteristics of the larger area would be fairly uniform to those found near the 8 test well sites. Respondent makes a major point out of the use of such assumptions in preparing the 1973 Barton report, suggesting they affect the validity of the study. Indeed, Mr. Barton readily admits that as each new well was drilled, information obtained as to the underlying geologic formation could very well differ from that previously assumed to exist. However, we do not think that the use of such assumptions seriously affects the usefulness of the 1973 Barton report in light of its purpose. In fact, the use of such assumptions seems to us to be a practical necessity, and there is no suggestion that such assumptions were not drawn in conformity with prevailing professional standards.↩
11. As early as 1964, petitioner was offered $750,000 for its Athabaska lease. In 1977 petitioner itself tried unsuccessfully to purchase Wood's half of their joint Athabaska lease for $1,000,000.↩
12. the parties' stipulation says "appropriated retained earnings" but that is clearly in error. ↩
13. We have adjusted both the retained earnings and increase over prior years' figures to reflect petitioner's concession that certain payments to its principal shareholder represented a constructive dividend distribution. See n. 1, supra.↩
14. Adjusted to reflect petitioner's concession on the constructive dividends issue. See n. 1, supra.↩
15. We are not aware of any procedure by which a negative liability can come into existence, nor does the schedule attached to petitioner's 1976 tax return (Form 1120) provide a great deal of insight into petitioner's computation thereof. It appears that petitioner overpaid its accrued Federal income and state and local taxes for 1976 by way of estimated payments and this amount represents anticipated tax refunds, which should be listed as an asset. In any event, mathematically the distinction results in no difference herein as the net liquid assets figure for the year remains the same under either method.↩
16. Petitioner was granted an extension until December 11, 1978 to submit a statement pursuant to section 534(c) for taxable years 1975 and 1976.↩
17. In petitioner's section 534(c) statement of December 7, 1978, paragraph (b) thereof deals separately with $4,000,000 allegedly required for the purchase of "producing properties," while paragraph (c) contains a general reference to acquisition of "partnership interests." The evidence in the record dealing with the purchase of "producing properties" concerns petitioner's offer to purchase Keener's 50-percent interest in an oil field in which petitioner and Keener were joint venturers. The proffered purchase price for this property was $4,000,000. Viewed in this light, we think the ground alleged in paragraph (b) of the December 7, 1978, section 534(c) statement, purchase of "producing properties," is but a more narrow statement of the alleged ground of acquiring "partnership interests" set out in paragraph (c) and not a separate ground alleged to constitute a reasonable business need. We note that petitioner treated the "acquisition of partnership or other producing properties" as a single ground in its briefs filed herein. Indeed, even after respondent had addressed the purchase of "producing properties" and acquisition of "partnership interests" as separate grounds in his opening brief, petitioner grouped them together again in its reply brief thereto. Accordingly, we will treat the purchase of producing properties and acquisition of partnership interests as a single ground alleged to constitute a reasonable business need.↩
18. As United States v. Donruss Co.,393 U.S. 297 (1969) teaches us, even if the accumulation is unreasonable, the taxpayer still has the opportunity to try to show that avoidance of shareholder tax was not "one of the purposes" of the accumulation. In most cases, as a practical matter, this may be virtually an insuperable burden if the accumulation is unreasonable. This Court's order of April 1, 1982, which placed the burden of proof on respondent as to the reasonableness of most of the grounds for accumulation set forth in petitioner's section 534(c) statements, does not relieve petitioner of its overall burden of proving the absence of the proscribed purpose. Pelton Steel Casting Co. v. Commissioner,28 T.C. 153 (1957), affd. 251 F. 2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958↩ (1958).
19. The fact that petitioner intended that any development of the Athabaska property and therefore use of the earnings and profits would be conducted through petitioner's 99-percent-owned subsidiary, Canadian Rhoades, is irrelevant herein.See sec. 1.537-3(b), Income Tax Regs.; Chaney & Hope, Inc. v. Commissioner,80 T.C. 263, 283↩ n. 8 (1983).
20. While petitioner's section 534(c) statements place a figure of $6 million on this anticipated business need in each year (a total of $6 million, not a cumulative $18 million for the three years), that figure included an inflation factor of over $2 million. It should be noted that petitioner's total accumulation of earnings and profits peaked at $6,600,012 in 1976 (with somewhat less for total net liquid assets). And the total increases in accumulated earnings for each year 1974, 1975, and 1976 were only $1,302,874, $1,123,901, and $759,409, respectively. In other words, with the other reasonably anticipated business needs discussed earlier and with those to be discussed below, it is obvious that as a practical matter petitioner's accumulated earnings (both from prior years and for the current year) did not cover its other reasonable business needs in 1974 and 1975. For 1976 with some of the earlier anticipated needs such as purchase of the Keener property disappearing, at most less than $2 million from accumulated earnings from prior years and the $759,409 for the current year could have been put aside for this business purpose. ↩
21. Again we are mindful that up to the present time petitioner has not gone forward with its Athabaska project. Assuming petitioner continued to retain accumulated earnings and profits for that purpose indefinitely, there undoubtedly would come a point where it would become unreasonable to continue to do so. We of course express no opinion as to any years other than those involved in the instant case. The regulations tell us we should not rely upon subsequent events to show that the retention of earnings was unreasonable at the close of the taxable year if all elements of reasonable anticipation are present at the end of the taxable year. Sec. 1.537-1(b)(2), Income Tax Regs. Having heard the testimony of petitioner's officers and having found their testimony forthright and entirely worthy of belief, the Court is satisfied that they reasonably believed at the time that they should accumulate all the money they could to self-finance this project in what they then reasonably thought would be the relatively near future. That same regulation further says that subsequent events may be considered to determine whether the taxpayer actually intended to consummate the plans for which the funds were accumulated. Again, the fact that the Athabaska Tar Sands project has not been developed up to this date does not persuade the Court that petitioner lacked the intention in the years before the Court. In other words, to the extent that petitioner accumulated its retained earnings beyond the amount required for its other business needs, the Court is satisfied that the amount was reasonably accumulated during the years at issue for the purpose of the Athabaska project. See n. 20, supra.↩
22. Only $750,000 of the total $1,500,000 allowed for the Whitebead Pool is listed here to reflect the fact that $750,000 of such total has been conceded by respondent and is already included in the $1,380,000 anticipated drilling budget for 1974. ↩
23. Since petitioner's other reasonable business needs for 1974 and 1975 already exceed petitioner's net liquid assets for those years, we have not included any amount for the Athabaska Tar Sands project for those years, although we think an amount of $1,500,000 to $2,000,000 for that purpose would be reasonable for each year. See nn. 20 and 21 above. For 1976 we have included only $1,500,000 because even with this more conservative figure, petitioner's reasonable business needs still exceed the net liquid assets available for that year.↩
24. Since we have found that petitioner did not retain or accumulate its earnings beyond its reasonable business needs, the presumption of a tax-avoidance purpose under section 533(a)↩ does not come into play. Moreover, with or without any such presumption, we would not find the proscribed purpose in this case. Even if we had substituted our judgment for that of petitioner's corporate management as to its reasonable business needs, we would still conclude that any "unreasonable accumulation" was nonetheless accumulated for the business purposes claimed and not for any purpose of avoiding the income tax with respect to its shareholders. While one shareholder was in the 50-percent tax bracket, that was not the highest marginal rate for the years before the Court. More importantly, the record is simply devoid of any evidence that that shareholder's tax situation played any part in the corporation's decision to retain or accumulate earnings. We are satisfied that petitioner's practice and desire to self-finance its operations and the conservative business policies of its officers, rather than any tax-avoidance motives, explain any accumulations of earnings.